## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DUANE ZIEMBA | : | PRISONER |
| | : | NO. 3:02CV02216(DJS) |
| VS. | : | |
| | : | |
| JOHN ARMSTRONG, ET AL. | : | SEPTEMBER 12, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants in the above-captioned matter move for summary judgment in their favor as there is no genuine issue of material fact and the Court can find as a matter of law that the defendants did not exhibit deliberate indifference and that all defendants are entitled to qualified immunity.

## I.     FACTS

### A.     PLAINTIFF'S ALLEGATIONS

The plaintiff, an inmate acting *pro se*, brings this action against eleven defendants "in their individual capacity only":  former Commissioner of Correction John Armstrong (hereinafter "Armstrong"), Deputy Commissioner Jack Tokarz, Deputy Commissioner Peter Matos, former Warden Larry Myers, Thomas Coates, Michael Lajoie, Christine Whidden, Lt. Dennis Oglesby, Dr. Edward Blanchette, Dr. Wright, and Nurse Patricia Wollenhaupt.  Third Amended Complaint (hereinafter "Thrd. Amd. Com.") ¶¶ 5-11.

### 1.     Denial of Right to Out-of-Cell Meaningful Exercise and Recreation

The plaintiff alleges that defendants Armstrong, Tokarz, Matos, Myers, Coates, Lajoie, and Whidden denied his Constitutional right to exercise because he was forced to wear full mechanical restraints during his out-of-cell recreation periods.  Thrd. Amd. Com. ¶¶ 13, 19-20,

28, 35-37, 41, 61-63, 75.  The plaintiff alleges that the full mechanical restraints were utilized without penological justification.  Thrd. Amd. Com. ¶¶ 31-32.  As a consequence, the plaintiff alleges that from May 18, 2002 until on or about April 20, 2003, he suffered a total or near total deprivation of exercise and recreation.  Thrd. Amd. Com. ¶¶ 33.  The plaintiff further alleges that denial of meaningful exercise "has caused an extreme and prolonged situation where movement is denied and muscles allowed to atrophy, thereby physical and psychological health is threatened and has been in this case."  Thrd. Amd. Com. ¶¶ 21.

The plaintiff also alleges that spending recreation time in full restraints created an excessive risk to his safety and well-being.  Thrd. Amd. Com. ¶¶ 22.  The plaintiff does not allege that full mechanical restraints out of his cell ever prevented him from exercising within his cell.  The plaintiff merely argues that he could not exercise in his cell due to its small size, poor ventilation, inadequate water supply, and his cellmate.  Thrd. Amd. Com. ¶¶ 27.  The plaintiff also acknowledges that he had the opportunity to spend one hour, five days a week, out of his cell for recreation.  Thrd. Amd. Com. ¶¶ 14-16, 29.  But the plaintiff admits that he chose not to leave his cell to go to recreation during this entire time period.  Thrd. Amd. Com. ¶¶ 33.

The plaintiff also alleges that defendants violated CT. D.O.C. Administrative Directive 9.4, which states, "Administrative Segregation (phase one) restraints required unless in a secure individual recreation area."  Thrd. Amd. Com. ¶¶ 17-18.  Of course, this directive only states that restraints may be removed, not that they must be removed.

The plaintiff further alleges that inmates are physically forced outside during inclement weather, subjecting them to an excessive risk of harm and suffering.  Thrd. Amd. Com. ¶¶ 23.

But the plaintiff then alleges that inclement weather prevents inmates from going outside for recreation because they are not provided with gloves, hats, or boots.  Thrd. Amd. Com. ¶¶ 25-26.

Finally, the plaintiff alleges that the defendants were placed on actual or constructive notice of their alleged violations, but refused and failed to remedy them.  Thrd. Amd. Com. ¶¶ 39-40.  As a consequence of the defendants' alleged actions and omissions, the plaintiff argues that he suffered various physical and emotional injuries.  Thrd. Amd. Com. ¶¶ 38-39.

**2.     Allegations of Deliberate Indifference: Denial of Medical Care**

The plaintiff alleges that defendants Armstrong, Tokarz, Matos, Myers, Coates, Lajoie, Whidden, Oglesby, Blanchette, Wright, and Wollenhaupt were deliberately indifferent for failing to provide constitutionally adequate medical care.  Thrd. Amd. Com. ¶¶ 65, 70.  In completely vague terms, the plaintiff alleges that the defendants knowingly disregarded an excessive risk to the plaintiff's health and well being, apparently because they never ordered certain unnamed individuals to handcuff the plaintiff in the front rather than behind the back.  Thrd. Amd. Com. ¶¶ 48-50.  Again, the plaintiff fails to allege any specific events or the involvement of any specific individuals to support this claim.  Thrd. Amd. Com. ¶¶ 65.  The plaintiff further alleges that the defendants' apparent disregard for these unspecified risks caused him physical and mental injury, which violated the plaintiff's rights under the Eighth and Fourteenth Amendments of the United States Constitution.  Thrd. Amd. Com. ¶¶ 65.  The plaintiff contends that these alleged back injuries were previously reported to all of the defendants "verbally and through numerous requests, letters, grievances and appeals. . . ."  Thrd. Amd. Com. ¶¶ 46.

3

### 3.     **Allegations of Excessive Force**

The plaintiff makes excessive force allegations against all of the defendants that are also vague and attributed to no one in particular.  Thrd. Amd. Com. ¶¶ 46-47, 67.  He alleges that unnamed staff members, at unspecific times, used excessive and unnecessary force by handcuffing the plaintiff behind the back, instead of in front.  Thrd. Amd. Com. ¶¶ 46.  More specifically, he alleges that the force used by "staff, agents, employees and all persons working in concert with [the defendants], was unreasonable and excessive," in violation of his constitutional rights.  Thrd. Amd. Com. ¶¶ 67.  The plaintiff argues that this alleged excessive force subjected him to serious injury, and continuous pain and suffering.  Thrd. Amd. Com. ¶¶ 47.

The plaintiff further alleges that all of the defendants, with deliberate indifference, knowingly injured him "horribly, grotesquely and painfully" even though he fails to claim any substantial injuries resulting from this alleged treatment.  Thrd. Amd. Com. ¶¶ 49-52.

The plaintiff also makes an extremely vague allegation that all of the defendants failed to protect him, listing no one specifically, but again citing all staff, agents, and employees in general that have ever handcuffed the plaintiff behind the back.  Thrd. Amd. Com. ¶¶ 53, 69-70. The plaintiff alleges that the defendants acted with reckless or callous indifference to his dignity as a human being and to his Constitutional rights.  Thrd. Amd. Com. ¶¶ 54.  As a result, the plaintiff alleges to have suffered "serious pain, fear, anxiety, mental anguish, discomfort, embarrassment and humiliation, and physical and mental serious injury."  Thrd. Amd. Com. ¶¶ 55.

The plaintiff also asserts that the defendants participated directly in the alleged constitutional violations in that they failed to act on, or remedy these violations after allegedly being informed about them.  Thrd. Amd. Com. ¶¶ 69.  The plaintiff also alleges that the defendants created a policy and custom under which inmates would be forcefully handcuffed behind their backs despite a serious medical condition preventing use of such force.  Thrd. Amd. Com. ¶¶ 69.  In addition, the plaintiff alleges that the defendants were deliberately indifferent in supervising and training the subordinates who committed the "wrongful acts."  Thrd. Amd. Com. ¶¶ 69.  Again, the plaintiff fails to name or identify any of these "subordinates".  Thrd. Amd. Com. ¶¶ 69.  Finally, the plaintiff alleges to have exhausted all available administrative remedies.  Thrd. Amd. Com. ¶¶ 56.

## B.    DEFENDANTS' FACTUAL SUMMARY JUDGEMENT PRESENTATION

### 1.    Facts Regarding the Plaintiff's Behavioral History

The plaintiff has been in and out of the custody of the Department of Correction (hereinafter "DOC") for many years.  **Ex. A DOC RT 60 Screen.**   The plaintiff first entered prison in 1984 and began increasingly longer periods of incarceration thereafter.  **Ex. A.**   In 1997, the plaintiff escaped from DOC custody while on Community Release status, and was subsequently returned to the custody of the Department of Correction with additional charges including larceny.  **Exs. A; E Inmate Master File portions; R Transport Request Package.**  Since 1997, Ziemba has continuously been in the custody of the Connecticut Commissioner of Correction.  **Ex. A.**   His current sentence does not expire until June of 2013, however he has recently been paroled effective in March of 2006.  **Exs. C, RT 50 screen; B, RT 51 screen.**

To say that the plaintiff has been a management problem for DOC officials would be an understatement.  The plaintiff has received 63 Disciplinary Reports during his incarceration. **Exs. D, RT 67; A.**  The plaintiff's disciplinary history includes being found guilty by the Department of Correction of Assault on a DOC employee, three charges of Attempted Assault on a DOC employee, fighting, numerous times being found guilty of threats, numerous times being found guilty of interfering with safety and security, and attempted escape in an incident separate from his escape from Community Release.  **Exs. A; D; E.**

The plaintiff's initial terms of incarceration from 1984 until 1997 were relatively calm. **Exs. A; D.**  Despite serving 5 separate periods of incarceration prior to being returned from his escape from Community Release in 1997, with those five separate periods totaling approximately six years and 9 months, the plaintiff received only 7 Disciplinary Reports prior to September of 1997.  **Exs. A; D.**  In September of 1997, while housed at Cheshire, the plaintiff incurred Disciplinary Reports for fighting and Interfering with Safety and Security.  **Exs. A; D.** On this date, the plaintiff refused to exit the shower and barricaded the shower entrance with plastic chairs.  **Ex. E, 139; F, Administrative Seg. file.**  At this point, the plaintiff was temporarily transferred to Northern for a period of little over a month then back to a lower security level facility.  **Ex. A.**  While at Northern, the plaintiff received a hearing regarding placement in Administrative Segregation ("AS") at Northern, and his placement at Northern at that time was not authorized.  **Ex. E.**  The plaintiff was warned at this point in time however, that "any additional Disciplinary Reports would result" in a review of his status.  **Exs. E 139; F.**  The plaintiff then started regularly incurring Disciplinary Reports at various facilities, garnering 10 Disciplinary Reports in a period of 7 months.  **Exs. A; D.**

On August 11, 1998, the plaintiff attempted to escape, destroying the ceiling to his cell at Garner by kicking it and tampering with a fixture in the ceiling as well flooding the cell and ripping the toilet out of the floor and using pipes from the toilet to hit the window to the cell. **Exs. D, E 139; F; M 524.** The plaintiff had previously received criminal charges for a different escape, ultimately resulting in time being added to his term of incarceration. **Ex. L, Transfer Request Package.** On the same day he destroyed the ceiling, 8/11/98, the plaintiff was again transferred to Northern. **Ex. A.** Despite being placed in the Phase Program at Northern in an effort to control his behavior, the plaintiff continued to be a management problem. **Ex. E.**

The plaintiff continued to receive numerous Disciplinary Reports and sanctions at Northern throughout the remainder of 1998 and through 1999. **Exs. D, E. 186-243.** In November of 1998, the plaintiff was sentenced to a much longer sentence than previously, which certainly did not positively impact his institutional behavior. **Exs. A; E 244; G 3/31/99 Letter from Dudley to Levesque.** In September of 1999, the plaintiff had another significant incident, and was internally charged with and convicted of multiple counts of Attempted Assault on an Officer as well as other charges. **Exs. D; E, 186-207.** During this incident the plaintiff swung at Correctional Officers despite being restrained and was spitting. **Ex. E 198, 204.**

The plaintiff proved adept at slipping his restraints, including handcuffs, having to have them applied multiple times, breaking them on at least one occasion and attempting to break them on another. **Ex. E 186, 187.** As he did so frequently, the plaintiff fought his disciplinary charges, pleading not guilty and appealing them all, typically accusing staff of a variety of improper behavior. **Ex. E, 186-207.** The plaintiff garnered yet another ticket in October of 1999 on a charge he incurred frequently, Interfering with Safety and Security **Ex. D.** Three

months later, on January 20, 2000,  the plaintiff was transferred to Nevada under the prisoner

exchange program.  **Ex. A.**

      2.      **Facts Preceding Plaintiff's Placement at Northern**

      The plaintiff was ultimately transferred back to Connecticut on March 28, 2002 and was

initially placed at Cheshire Correctional Institution.  **Ex. A.**  The events precipitating Ziemba's

return to Northern two months later were as follows.  **Ex. A.**   On that date, Ziemba initially

received a Disciplinary Report for Interfering with Safety and Security.  **Ex. E.**  As a result of

this initial Disciplinary Report, the plaintiff was placed in the Restrictive Housing Unit at

Cheshire, where his behavior rapidly deteriorated.  **Ex. E.**  The plaintiff "began yelling and

banging on the cell door.  Shortly thereafter, with [Major Hall and then Commissioner

Armstrong] in his unit, he flooded his cell, banged on the door, and partially removed the toilet

from its secured position."  **Ex. E.**  Even after the toilet was removed and the water shut off, the

plaintiff "continued to manifest his frustrations through physical destruction of state property and

a self-injurious disposition."  **Ex. E.**  This was the second time the plaintiff had either removed

or partially removed a toilet from its fixed position within a cell.  **Ex. E.**

      Correctional officials at Cheshire then placed the plaintiff in four point soft restraints.

**Ex. E.**  The plaintiff was able to and did free himself from the soft restraints and was then placed

in "hard restraints", as in handcuffs and chains, and was placed on "four-point status".  Even on

four point status, the plaintiff continued "yelling at Lt. Murray and acting again in a hostile

manner."  **Ex. E.**

3.    <u>**Time Period in Question**</u>

Based on all of this behavior, the plaintiff was once again returned to Northern on May 18, 2002.  It is the time period from May 18, 2002 until April 20, 2003 during which the plaintiff claims he was denied sufficient opportunity for unrestrained outdoor exercise and was handcuffed behind his back which he alleges caused him severe injury.

Three months after his placement in Phase I of the Administrative Segregation program at Northern, the plaintiff received a Disciplinary Report for Interfering with Safety and Security. **Ex D.**  In the incident leading to this Disciplinary Report on August 27, 2002, the plaintiff refused to allow correctional officials to remove their restraints.  **Ex. E.**  During the incident "Ziemba continued his verbal threats and stated he was going to sue all staff present."  **Ex. E.**

Several weeks later, on October 1, 2002, the plaintiff was convicted of another Disciplinary Report, this one for fighting, and another month later, on November 4, 2002, he received yet three more Disciplinary Reports for Destruction of Property, Flagrant Disobedience, and Interfering with Safety and Security.  **Ex. E.**   Early in the new year, the plaintiff was convicted of two more Disciplinary Reports, one for Contraband and another for Destruction of Property.  **Ex. E**.  The combination of Ziemba's repeated disciplinary problems resulted in the plaintiff's continued confinement in Phase I of the Administrative Segregation program at Northern.  **Ex. G, Captain Shea Aff. ¶ 4.**

4.    <u>**Administrative Segregation Program at Northern**</u>

Northern was at the time in question and is now the designated restrictive housing facility for the Connecticut Department of Correction, managing those inmates who have demonstrated a serious inability to adjust to confinement in prison and pose a serious threat to the safety and

security of a correctional facility.  **Exs. H Northern website description; G ¶ 5.**  Placement in the Administrative Segregation Program at Northern both in 1999 and since then comes after a hearing, and the decision of the Hearing Officer may be appealed.  **Exs. I, Administrative Segregation description; G ¶ 6.**

Since 1999, the Administrative Segregation Program has consisted of a three phase program.  **Exs. H; I; G, ¶ 7.**  The Administrative Segregation Program "operates on the basic assumption that inmates who engage in aggressive, violent, disruptive behavior, or who pose an imminent risk … require a highly structured and secure environment."  **Exs. H; I; G ¶ 8.**  In Phase I, which at the time lasted for at least six months if an inmate was discipline free, or longer if not, inmates are allowed very little time out of their cells.  **Exs. H; I; G, ¶ 9.**  Meals are eaten in the cells; inmates are restricted to three showers and five hours of recreation per week.  **Exs. H; I G.**  Phase I inmates are precluded from any work assignments.  **Exs. H; I; G ¶ 9.**

While he was housed in Phase I of the Administrative Segregation program at Northern, the plaintiff was housed in Units One West and One East.  **Exs. G ¶ 10; H.**  While in Phase I, the plaintiff typically shared a cell with another inmate.  **Ex. G ¶ 10.**  The size of the double cell that the plaintiff shared while in Phase I was approximately 8 by 10 feet, containing nearly 80 square feet.  **Ex. G ¶ 11.**  The cell contained two narrow beds one over the other, and a toilet.  **Ex. G ¶ 11.**

Recreation in Phase I was and is provided for one hour per day five days per week, but is entirely voluntary.  **Ex. G ¶ 12.**  It was the policy at Northern up until April of 2003 that inmates in Phase I of the Administrative Segregation program, no matter the length of time they had been in Phase I, were required to participate recreation in full restraints for the entire duration of their

stay in Phase I.  **Ex. G ¶ 13.**  This is still the policy for inmates who have initially been placed in Phase I of the Administrative Segregation program at Northern, although the policy has been changed so that the rule regarding recreating in restraints *may* be relaxed after 30 days under certain conditions.  **Ex. G ¶ 14.**

For his one hour of recreation five days per week, a Phase I inmate is escorted in full restraints into an outdoor recreation area surrounded by a chain link fence.  **Ex. G ¶ 15.**  The inmate remained in full restraints for the duration of the hour, and then was escorted back to his cell.  **Ex. G ¶ 15.**  The inmate is free to walk and move about the recreation area in the fresh air, and inmates recreating in this manner usually spend most of the time walking around.  **Ex. G ¶ 16.**  The recreation yard is approximately 20 by 20 feet.  **Ex. G ¶ 16.**

Full restraints within the Connecticut Department of Correction includes handcuffs behind the back, leg irons, and a tether chain from the leg irons to the handcuffs.  **Ex. G ¶ 17.**  While the restricted conditions of recreation for a Phase I Administrative Segregation inmate are a far cry from the basketball, television, volleyball and other indoor and outdoor recreational activities available to Connecticut's general population inmates at the time and currently, these measures were considered necessary due to the security threat posed by Phase I inmates given their behavior resulting in placement in Phase I.  **Ex. G ¶ 18.**

Inmates who have shown a propensity for violence against correctional staff or other inmates within a correctional setting have been can be ingenious in their destructiveness.  **Ex. G ¶ 19.**  They can hold trap doors open while unrestrained, they can swing handcuffs around after the first one is applied to one hand, and they refuse to re-cuff, among other things, all of which can disrupt the daily routine of a facility.  **Ex. G ¶ 20.**

Thus, the defendants do not dispute that during the time period in question, inmates in Phase I of the Administrative Segregation were required to recreate in restraints for reasons of safety and security. **Ex. G ¶ 21.** Inmates in Phase I Administrative Segregation both now and during the time in question are not, however, restrained during the time that they spend inside their cell. **Ex. G ¶ 21.**

The cells at Northern are large enough to accommodate calisthenics such as sit-ups, push-ups, jumping and running in place. **Ex. G ¶ 22.** The policy of recreating Phase I Administrative Segregation inmates at Northern in restraints while they could do more intensive calisthenics in their cell accommodated both the inmates' needs for fresh air, walking, and time out of their cell while allowing the inmates' needs for more vigorous exercise, if they chose to engage in it, to be accomplished within the confines of their cell. **Ex. G ¶ 23.**

### 2.  Facts Regarding the Plaintiff's Medical History

Plaintiff's medical records do not indicate any significant problem with plaintiff's back. **Exs. M, medical records; N, Dr. Blanchette Aff. ¶ 6.** In March of 1998, long before his placement at Northern, yet while in custody, plaintiff's back was x-rayed twice with two different views after an altercation with an officer, and other x-rays to rule out back problems followed. **Exs. M, 190, 191, 192, 222, 224, 311, 313, 315; N ¶ 7.** The conclusion reached by one radiologist was "Minimal anterior wedging of what appears to be T7, ? old Scheuermann's disease." **Exs. M 190; N ¶ 8.** Scheuermann's disease is a condition formed during growth years when the front of a disc or discs in the back do not grow at the same pace as the back. **Ex. N ¶ 8.** The radiologist reading the report also said that the *minimal* wedging he noted could also be the product of trauma. **Exs. M 190; N ¶ 9.** Earlier that same month, another radiologist reported

that several "views of the lumbosacral spine reveal no evidence for acute fracture or dislocation. No subluxation is evident." **Exs. M 191; N ¶ 9.** Also on that date the radiologist concluded "No acute abnormality of the lumbosacral spine." **Exs. M 192; N ¶ 10.** He also noted "*mild*" narrowing at the cervical portion of the plaintiff's spine, but again concluded, "No acute fracture, subluxation or dislocation evident." **Exs. M 192; N ¶ 10.**

In April of 1998, approximately one month later, additional x-rays of the plaintiff's back (and sinuses) were taken. **Exs. M 189; N ¶ 11.** The conclusion again with regard to the Thoracic spine was "No significant interval change". **Exs. M 189; N ¶ 11**. In May of 1998, a doctor ordered x-rays of plaintiff's back and the plaintiff complained about the x-rays. **Exs. M 222; N ¶ 12.** The plaintiff argued with medical staff that month, May of 1998, about the cause of his alleged back problems. **Exs. M 221; N ¶ 12.**

The plaintiff's doctor noted in May of 1998 that there were no acute changes on spinal x-rays but that the plaintiff was "unsatisfied with NSAID [anti-inflammatory medicine; Motrin] and bedrest." **Exs. M 224, 228; N ¶ 13.** The treatment plan for plaintiff at that time was to continue conservative management and seek an orthopedic consult if an "adverse clinical change occurred." **Exs. M 224; N ¶ 14.** The reporting doctor indicated with regard to the plaintiff, "He feels pain is being ignored. Litigation is highly likely." **Exs. M, 228; N ¶ 15.**

In June of 1998, plaintiff complained to medical staff, "You had x-rays of my back taken and told me they show nothing wrong. I am again telling you something is seriously wrong." **Exs. M 217; N ¶ 16.** Medical staff responded that the plaintiff had been seen 5 times from March to May of 1998 and had as of the last visit reported being comfortable after Motrin. **Exs. M 217; N ¶ 17.**

None of the custodial defendants were involved in any decisions regarding treatment for the plaintiff's alleged back pain during the time period in question.  The defendant Dr. Wright did treat the plaintiff on one occasion, as described below.  Although Nurse Wollenhaupt did respond to many of plaintiff's written requests regarding his alleged back pain and other issues by noting that the plaintiff had been seen by a doctor regarding this alleged pain, she did not make medical decisions regarding the plaintiff's treatment for his back.  **Exs. M 218, 220, 221, 222, 223, 236, 238, 23, 240, 241, 242, 248, 249, 250, 251, 252, 253, 254 259, 273, 288, 289; N ¶ 18**.  While there is certainly ample evidence that plaintiff complained about a back problem in 1998 and thereafter, there is likewise ample documentation that plaintiff was seen and treated for his alleged back problems by medical staff, that his problem was not ignored, Motrin and Tylenol were prescribed, and no acute or serious back injury was ever determined to exist.   **Exs. M 189, 190, 191, 192,  217, 218, 220, 221 222, 223, 228, 232, 236, 238, 239, 240, 241, 242, 248, 249, 250, 251, 252, 253, 254, 259 273, 288, 289, 301; N ¶ 19.**  In terms of plaintiff's condition as perceived by medical staff, aside from his verbal complaint, the following was noted:

> No change in x-ray findings.
> Lumbar spine, no vertebral tenderness
> No limp in walk
> Lumbar pain L [left] sided more than thoracic spine level pain

**Exs. M 304; N ¶ 20.**  These objective findings do not support plaintiff's claims about a serious back condition being mistreated by the application of restraints in the back.  **Ex. N ¶ 21.**  Indeed, handcuffing a person in the back stretches the front, chest muscles, but would have no impact on the back one way or another.  **Ex. N ¶ 21.**

On April 20, 1998, while at MacDougall-Walker Correctional Institution, the plaintiff wrote an Inmate Request Form in which he stated, "I refused a medical trip today because my

back seriously hurts.  It is not humane for belly-chains to be raped [sic]  around my back with padlock behind my back.  I was 3:00 AM forced to refuse trip for this reason.  I am trying to heal not be hurt worse.  Can this be rescheduled with restraints being used <u>anyway</u> but raped [sic] around my back.?”  **Exs. A; M 253; N ¶ 22.**  Nurse Wollenhaupt stated to the plaintiff in response to his requests that, “Unfortunately, we can not deviate from the Administrative Directive.  You have no gross documented anomalies of the back.  We will try to rebook it if you agree to go according to the Administrative Directive.”  **Exs. M 253; N ¶ 23.**

Interestingly, plaintiff’s request to be transported with less restrictive restraints to a medical appointment at an “outside” hospital, UConn, due to a purely subjective back problem, predated by only months his escape attempt in August of 1998, and came after his criminal escape from DOC community placement.  **Exs. M 253; D; E 139; F.**

In May of 1998, Dr. Silvis, not a defendant in this matter, noted the plaintiff, still at MacDougall, was “Upset because I noted in chart he refused to go to UCONN wearing certain restraint—This is simply a well documented fact that can not be covered-up to help I/M [inmate] Ziemba in his personal use of his medical file.”  **Exs. A; M 296; N ¶ 24.**  The doctor further noted on that date that he had requested an orthopedic visit for the plaintiff “because unsatisfied.”  **Exs. M 297; N ¶ 25.**  The doctor further noted, “Back pain complaints have been on-going since initial assault.  No change in x-rays c/ [with] no fx [fracture] ever seen.”  **Exs. M 297; N ¶ 26.**

On a separate occasion in May of 1998, the plaintiff indicated to other medical staff that “He had not issues about the restraints except that he asked custody staff to be ‘reasonable’”  **Exs. M 301; N ¶ 27.**  While in April of 1998, medical staff felt the plaintiff might have

experienced a muscle spasm in his back, staff charted that the plaintiff himself aggravated this by

working out.  **Exs. M 307; N ¶ 28.**  Medical staff prescribed Motrin and Naproxen for plaintiff's

pain from April through July of 1998.  **Exs. M 390-392; N ¶ 29.**

      In August of 1998, the plaintiff's back was functioning well enough that he was able to

rip the toilet off of the floor or wall of his cell at Garner, break a fixture in the ceiling and crawl

up into the ceiling.  **Exs. M 355, 540, 541; D; E 139; F; A; N ¶ 30.**  The plaintiff was also able

to destroy three sets of handcuffs at this time, breaking two sets at one time.  **Exs. M 505, 541.**

This was considered an escape attempt.  **Ex. D.**  At this point in time, the plaintiff was restrained

and medical staff checked on him frequently, typically every two hours.  **Exs. M 492-502; N ¶**

**31.**  During all of these checks, the plaintiff made no complaints of back pain, and medical staff

noted on more than one occasion, "No c/o [complaints of] discomforts and no obvious s/s [signs

or symptoms] of distress."  **Ex. M 492-502; N ¶ 32.**  The plaintiff was transferred to Northern at

this time.  **Ex. A.**  On September 8, 1998, plaintiff complained to staff that his back was not

getting better and he was referred to "Sick Call" which is how inmates make a medical

appointment.  **Exs. M 485; N ¶ 33.**  Also in September of 1998, another x-ray was taken of

plaintiff's back.  **Exs. M 517; N ¶ 34.**  The results were provided by UConn radiology, which

noted, "Some degenerative changes, no acute disease."  **Ex. M 517; N ¶ 34.**

      Clinical notes from September 11, 1998, reflect an extensive exam of plaintiff's

complaints as related to his back vis-à-vis objective factors related to back pain.  **Exs. M 519,**

**520; N ¶ 35.**  Seeing Nurse Clark, the plaintiff complained as follows:

> C/O [complains of] back pain since August 12th – c/o lower back pain that goes
> down my right leg.  I/M states previous hx [history] of back problems c/ [with]
> hospitalization for back on March of 1998.
**Exs. M 520; N ¶ 36.**

Obviously, this was a fabrication as the plaintiff's records from 1998 do not support any such "hospitalization for back on March of 1998." **Exs. M 190-220; N ¶ 37.** Indeed, the plaintiff's report of a back injury in 1998 was contradicted by his statement to Nevada medical personnel in 2000 that he had a "Back injury prior to incarceration." **Exs. M 1115; N ¶ 38.** Nurse Clark further noted in September of 1998: "gait observed steady; I/M slowly becoming verbally aggressive and demanding stating that he needs to be cuffed in front because he is 'so tall and my back hurts.'" **Exs. M 520; N ¶ 39.** The plaintiff wanted to be cuffed in front a month after destroying a cell and mechanical restraints. **Exs. M 253; N ¶ 40.** Cuffing certain inmates in front is considered a potential security risk as inmates can swing the cuffs about, causing injury, and inmates have been known to attempt to strangle others or otherwise cause harm when cuffed in front. **Ex. G.**

Nurse Clark noted as follows:

Sick call process explained to i/m [inmate] and his hx [history] of refusing to see the MD also discussed c/ i/m [with inmate]. No obvious distress or extreme discomfort noted; I/M denies being able to bend over to remove his sock for nurse to examine foot however custody staff reports that I/M is able to dress self and tend to … [illegible] c/ [with] no requests of assistance;
As stated, inmate denies exercising in cell but muscle tone noted to be good; I/M also initially stated that he was unable to move his toes but then stated he could move them; I/M noted to be able to propel body on and off exam table s/ [without] assistance and no c/o [complaints of] discomforts. I/M noted to bend at waist to sign inmate fee form c/ no c/o.

**Exs. M 519; N ¶ 41.**

Nurse Clark concluded as follows: "P) [Plan:] Continue c/ [with] cuff status in back per custody protocol." **Exs. M 519; N ¶ 42.**

In late September of 1998, the plaintiff engaged in behavior unlikely for someone with severe back pain, leading correctional staff to extract him from his cell. **Exs. M 483; N ¶ 43.** At

this point in time, the plaintiff complained of "internal bleeding" which was never substantiated, but did not complain of back problems and "denie[d] any other medical concerns/issues." **Exs. M 483, 484; N ¶ 44.**

In October of 1998, the plaintiff complained of several issues, including his back. **Exs. M 515; N ¶ 45.** Medical staff noted at that time that the plaintiff had "full mobility, able to amb[ulate] c/o [without] difficulty, [Zero] s/o [signs of] trauma." **Exs. M 515; N ¶ 45.** The plaintiff was given Motrin at this time. **Exs. M 515; N ¶ 46.**

In February of 1999, the plaintiff complained of back pain and was seen by medical staff. **Exs. M 518; N ¶ 47.** Staff referred the plaintiff to the September 1998 x-rays, and the plaintiff requested follow-up x-rays, and was referred to "MDSC", sick call with a doctor. **Exs. M 518; N ¶ 47.**

On March 4-5, 1999, the plaintiff was again in four-point restraints and thus assessed by medical staff at Northern. **Exs. M 456, 458; N ¶ 48.** The plaintiff did complain of lower back pain at this time, on some of the medical checks he received, along with numerous other issues, although he did not always complain of back pain at this time. **Exs. M 456-467, 476-477; N ¶ 49.** On March 9, 1999, the plaintiff had a physical incident with correctional staff after refusing an order and several medical issues were reported, none of which included his back. **Exs. M 422; N ¶ 50.**

The plaintiff's obviously lengthy medical chart reveals that he was seen frequently by various medical staff, including doctors, nurses and other professional on a frequent basis. **Exs. M; N ¶ 51.** Nurse Wollenhaupt was certainly entitled to rely on the assessments of various medical staff, and as a nurse responding to grievances or referring the plaintiff to a doctor or

APRN, was not in a position to second-guess the orders or assessments of physicians or other medical personnel who had physically examined the plaintiff. **Ex. N ¶ 52.** A review of the plaintiff's medical records reveals no objective back injury or any clinical reason to handcuff him in front. **Exs. M; N ¶ 53.**

On January 20, 2000, the plaintiff was transferred to Nevada. When the plaintiff arrived in Nevada, he continued to complain of an alleged back injury from 1998. **Ex. M 1052, 1053, 1064, 1065, 1068, 1069.** Prior to ever receiving any medical records from Connecticut, the doctor in Nevada opined, "**[P]art of his problem is that he is trying to get drugs, and they are not giving them to him**. He is receiving medication for the pain, but not heavy duty drugs." **Ex. Q, Nevada Medical correspondence.** The plaintiff's alleged back pain does not constitute a "serious medical condition". **Exs. M; N ¶ 54.** In Nevada, the plaintiff's complaints about his back pain primarily occurred in the year 2000, two years prior to his return to Connecticut in 2002. **Exs. M 1052, 1053, 1064, 1065, 1068, 1069, 1134; N ¶ 55.**

At the plaintiff's Intake Physical Examination in Nevada on February, 2000, he reported that his spine was "abnormal". **Exs. M 1030; N ¶ 56.** Objectively, the examiners findings on that date were that his everything was "NL", or, within normal limits. **Exs. M 1030; N ¶ 56.** Two years later, at his biennial physical on February 25, 2002, the plaintiff's spine was reported to be "normal". **Exs. M 1029; N ¶ 57.** Nevada prison officials had x-rays of the plaintiff's back performed in 2000. **Exs. M 1083-86; N ¶ 58.** No Nevada medical care provider ever opined that the plaintiff should only be handcuffed in the front. **Exs. M; N ¶ 58.** One care provider noted in June of 2000 with regard to the plaintiff's back pain, "Subjective complaints only—no objective physical exam findings." **Exs. M 1135; N ¶ 59.**

The plaintiff was returned to Connecticut in March of 2002, when he was initially placed at Cheshire Correctional Institution (hereinafter "Cheshire") and, as stated above, was returned to Northern on May 18, 2002. **Ex. A.** During the time period he was at Cheshire from March to May of 2002, the plaintiff complained only once of low back pain, and did not request that Cheshire medical staff issue an order that he only be handcuffed in the front. **Exs. M 1272; N ¶ 60.** The incident that lead to the plaintiff's placement at Northern on this occasion was him flooding his cell and "banging on [the cell] door with extreme force" then subsequently breaking his restraints **Ex. M 1269, 1366; N 61.** The plaintiff's stated back injury is inconsistent with using his arm to bang on his cell door with extreme force. **Ex. N ¶ 62.**

Upon his initial placement at Northern, the plaintiff made no complaint of any back discomfort. **Exs. M 1261-1270; N ¶ 63.** In June of 2002, the plaintiff's back was x-rayed based on a referral by Dr. Pesanti and APRN Katz-Feinberg when the plaintiff complained of back pain on June 7, 2002. **Exs. M 1182, 1260; N ¶ 64.** The conclusion of the UCONN radiologist was that the plaintiff has "mild diffuse degenerative arthritis." **Exs. M 1182; N ¶ 65.** This is an extremely common diagnosis, which in no way necessitates the plaintiff being handcuffed in the front and which does not constitute a serious medical condition. **Ex. N ¶ 65.**

On July 12, 2002, the plaintiff reported to the medical unit and saw the defendant Nurse Wollenhaupt. **Exs. M 1257; N ¶ 66.** All that Nurse Wollenhaupt did at this visit was refer the plaintiff to a doctor or APRN. **Exs. M 1257; N ¶ 66.** Nurse Wollenhaupt did not make any decision at the time with regard to the plaintiff's healthcare other than the referral, which was appropriate, and the plaintiff was indeed seen three days later by APRN Katz-Feinberg. **Exs. M**

**1257; N ¶ 67.** Katz-Feinberg, who is not a defendant in this matter, made the following notations in plaintiff's health record regarding his back:

      S [subjective]: C/O [complains of] continued back pain.

      O [objective]:    Mobility—able to get on/off exam table c/out

      [without] difficulty, on/off chair—gait stable

      A [assessment]:   **Stated** back pain.

**Exs. M 1257; N ¶ 68.** Katz-Feinberg prescribed Naproxen for the stated back pain of the plaintiff. She did not address the issue of plaintiff's claim in this lawsuit that it was medically necessary for him to be handcuffed in the front of his body as opposed to the back. **Exs. M 1257; N ¶ 69.** The care the plaintiff received from both Wollenhaupt and Katz-Feinberg was appropriate and well within the standard of care. **Ex. N ¶ 70.**

      In September of 2002, the plaintiff filed an Inmate Request form at Northern in which he stated, "Again, please immediately have the doctor order for custody staff to stop handcuffing me behind my back. Because it's seriously re-injuring my back. And denying me recreation." **Ex. M 1211; N ¶ 71.** The plaintiff had filed a similar request only three days earlier. **Exs. M 1212; N ¶ 72.** Both requests were responded to simultaneously and appropriately. **Exs. M 1211, 1212; N ¶ 72.** Nurse Wollenhaupt, who was not making decisions about the plaintiff's healthcare but who responded to his grievances noted correctly, "There is no medical contraindication to cuffing in the back. If anything, there would be an extension of the chest muscle not the back muscle. **Exs. M 1211; N ¶ 73.** Nurse Wollenhaupt also responded, "There is no medical problem that would interfere with cuffing in the back after three years." **Exs. M 1212; N ¶ 74.** This was an appropriate response by Nurse Wollenhaupt. **Ex. N ¶ 74.**

On November 1, 2002, the plaintiff reported to a nurse in the medical unit that his back was "seriously hurting" him.  **Exs. M 1256; N ¶ 75.**  The Registered Nurse evaluating him noted at the time that, despite his claims, the plaintiff ambulated within normal limits and was able to get in and out of the chair within normal limits.  **Exs. M 1256; N ¶ 75.**  Nonetheless, as had Nurse Wollenhaupt before her, this nurse referred the plaintiff to a doctor or APRN.  **Exs. M 1256; N ¶ 76.**

Notwithstanding what he alleged to be a serious back condition on November 1, 2002, the plaintiff was able on November 5, 2002 to destroy the handcuffs he was wearing while on "in cell restraint status" for flooding his cell, a disciplinary status during which he was restrained within a cell.  **Exs. M 120, 1257, 1242-43; N ¶ 77.**  He then reportedly became combative with staff when they intervened.  **Exs. M 1202; N ¶ 78.**  APRN Katz-Feinberg reported that the plaintiff "was trying to get out of his handcuffs and twisted open his cuffs in his bed frame injuring his wrists."  **Exs. M 1242-43; N ¶ 78.**  Katz-Feinberg did not order nor recommend any special handcuffing procedure for the plaintiff at this point in time, nor was any such order or recommendation warranted.  **Exs. M 1242-43; N ¶ 79.**

In early December of 2002, the plaintiff received correspondence from then Deputy Commissioner Tokarz "in response to your letter regarding pain in your back and related to handcuffing behind your back."  **Exs. M 1197; N ¶ 80.**  Medical staff was aware that the plaintiff himself felt this was an issue, and the correspondence indicates the plaintiff's concern was being evaluated and addressed.  **Exs. M 1197; N ¶ 81.**

On December 19, 2002, the defendant Dr. Wright diagnosed the plaintiff as having "DJD", or degenerative joint disease, in his back.  **Exs. M 1230; N ¶ 82.**  Degenerative joint

disease, also known as osteoarthritis, is the most common form of arthritis, affecting tens of millions of adults in this country. **Ex. N ¶ 83.** In diagnosing the plaintiff, Dr. Wright examined the plaintiff's x-ray reports from June of 2002, conducted a physical exam, and listened to the plaintiff's reported symptoms. **Exs. M 1230; N ¶ 84.** He then prescribed Naproxen. **Exs. M 1230; N ¶ 84.** Dr. Wright did not issue an order or recommendation that the plaintiff be handcuffed in the front, nor was one medically indicated or even advisable. **Exs. M 1230; N ¶¶ 85.** Dr. Wright treated the plaintiff's common condition in an entirely appropriate manner well within the applicable standard of care. **Ex. N ¶ 86.**

There was no medical necessity or reason to handcuff the plaintiff in the front as opposed to the back from May of 2002 though April of 2003 or at any time before or after that. **Ex. N ¶ 87.** The plaintiff has received appropriate, professional health care for his back throughout his tenure as an inmate and all such care has been well within the applicable standard of care. **Ex. N ¶ 88.**

**II.    LEGAL ARGUMENT**

    **A.    STANDARD OF REVIEW**

In a motion for summary judgment, the burden is on the moving parties to establish that there are no genuine issues of material fact in dispute and that they are entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir. 2000), Fed. R. Civ. P. 56(c). A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with Affidavits, if any, show that there is no genuine issue as to any *material* fact.'" *Miner v. Glen Falls,* 999 F.2d 655, 661 (2d Cir. 1993) (emphasis added) (citation omitted).

A dispute regarding a material fact is genuine "'if the evidence is such that a *reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir. 1992) (emphasis added) (quoting *Anderson,* 477 U.S. at 248, *cert. denied*, 506 U.S. 965 (1992).  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof," then summary judgment is appropriate.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

When a Motion for Summary Judgment is supported by documentary evidence and sworn Affidavits, the nonmoving party must present "significant probative evidence tending to support the complaint."  *Anderson,* 477 U.S. at 256 (*quoting First Nat. Bank of Ariz. V. Cities Serv. Co.,* 391 U.S. 253, 290 (1968).  A nonmoving party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a Motion for Summary Judgment."  *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987).

A party may not create a genuine issue of fact by presenting contradictory or unsupported statements.  *See Securities & Exchange Comm'n. v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir. 1978).  Nor may he rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found,* 51 F.3d 14, 18 (2d Cir. 1995);   *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the Affidavits in support of the motion for summary judgment are not credible).  A self-serving Affidavit which reiterates the conclusory allegations of the complaint in Affidavit form is insufficient to preclude summary judgment.  *See Lujan v. National Wildlife Fed'n.,* 497 U.S. 871, 888 (1990).

In this case, the plaintiff makes numerous vague and conclusory allegations.  In *Flaherty v. Coughlin,* the Second Circuit stated "[C]ertain claims are so easily made and can precipitate such protracted proceedings with such disruption of governmental functions that . . . detailed fact pleading is required."  567 F.2d at 553.

## B.    NO CONSTITUTIONAL VIOLATION IN RECREATION POLICY

### 1.    No Constitutional Violation

The plaintiff claims that the policy requiring him to recreate in restraints while in Phase I of the Administrative Segregation program at Northern violated his constitutional rights.[1]  The defendants respectfully submit that the plaintiff's claim regarding recreation in restraints fails to allege unconstitutional conditions of confinement tantamount to a violation of the Eighth Amendment.  In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court defined the applicable standard as follows:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exist, and he must also draw the inference.

*Id.* at 1979.  In order for prison conditions to rise to the level of an Eighth Amendment violation there must be a situation involving "unnecessary and wanton infliction of pain" which deprives inmates of the minimal necessities of life.  *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981).

---

[1]    The plaintiff also makes vague and contradictory allegations that he was forced to recreate in the cold and that he was denied exercise because it was cold.  Neither scenario is accurate, as the Affidavits make clear that recreation was voluntary, and that inmates could exercise in their cells.  Imagine if an inmate declined an opportunity to recreate Northern officials going so far as to force recreation.  See Captain Shea's Affidavit ¶ 12.

The defendants respectfully submit that the conditions in Phase I Administrative Segregation at Northern did not involve the unnecessary or wanton infliction of pain or punishment, but, rather, that the extremely poor, violent, and often creative institutional behavior of inmates housed in Northern's Phase I Administrative Segregation unit rendered the recreation in restraints policy well within the bounds of the Constitution.

The United States Supreme Court has made clear that in an Eighth Amendment case, it must be considered whether any given condition is justified by "any safety concern" in a prison. *Hope v. Pelzer*, 536 U.S. 730 (2002). This case is no exception to the rule that "prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

> . . . the Court also took into account – as one would do in an excessive force [case] – whether the punishment was justified by "any safety concern" in the prison. . . . this case occasions no exception to the rule that "prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979). . . . [W]e consider whether the Order was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [plaintiff]'s health and safety.

*Hope v. Pelzer*, 536 U.S. 730 (2002), stating:

Indeed, the United States Supreme Court has recognized that running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. . . . ***To respect these imperatives, courts must exercise restraint in***

*supervising the minutiae of prison life.*"  *McKune v. Lile,* 536 U.S. 24, 39-40 (2002) (emphasis

added).  In *Procunier v. Martinez,* the Court stated:

> Prison administrators are responsible for maintaining internal order and discipline,
> for securing their institutions against unauthorized access or escape, and for
> rehabilitating, to the extent that human nature and inadequate resources allow, the
> inmates placed in their custody.  The Herculean obstacles to effective discharge of
> these duties are too apparent to warrant explication.  Suffice it to say that the
> problems of prisons in America are complex and intractable, and, more to the
> point, they are not readily susceptible of resolution by decree.

416 U.S. 396, 404-405 (1974).

The defendants concede that exercise is one of the basic human needs protected by the

Eighth Amendment.  *See Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir. 1996); *Anderson v.

Coughlin,* 757 F.2d 33, 35 (2d Cir. 1985).  Likewise, courts have recognized that inmates are

entitled under the Constitution to spend a certain amount of time outside of their cells.  *See, e.g.,

Delaney v. Detella,* 123 F. Supp.2d 429, 435-440 (a useful summary of caselaw).  The

defendants submit that the plaintiff in this case received both 5 hours per week of outdoor

recreation in restraints, giving him access to fresh air and time to walk about outside of his cell,

and was also unrestrained in his cell, thus affording him the opportunity and space for more

vigorous exercise within his cell.  **See Ex. I, Blanchette Aff.**  The combination of these factors,

along with the security threat posed by the plaintiff and other Phase I inmates, renders the

plaintiff's claim deficient.  The defendants note that this case is distinguishable from a large

number of cases in which there is no outdoor recreation and/or no ability to exercise whatsoever,

while the attached Affidavits demonstrate that the plaintiff in this case had both.[2]  Moreover, this case has the element of inmates who have been given the opportunity for a variety of recreational and exercise activities in general population and have only lost those activities after notice and an opportunity to be heard regarding their own destructive behavior.

In *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir. 1996), the Second Circuit held that denying an inmate *all* outdoor recreation and requiring him to wear restraints whenever out of his cell for a period of over 7 weeks did not constitute an Eighth Amendment violation.  The Court upheld the trial court's granting of a Motion to Dismiss, stating, "[T]he deprivation alleged by the prisoner must be in objective terms 'sufficiently serious' such that the deprivation 'denied the minimal civilized measure of life's necessities.'"  *Id.*

In *Sostre v. McGinnis,* 442 F.2d 178, 186 (2d Cir. 1971), *cert. denied sub nom Sostre v. Oswald,* 404 U.S. 1049 (1972) and 405 U.S. 978 (1972), the Second Circuit opined that for an inmate in Segregated Confinement, "[a]n hour of exercise with four or five other prisoners in a small, enclosed yard, open to the sky" was acceptable under the Eighth Amendment.  *Sostre* also "implicitly established an important limitation on the Eighth Amendment's exercise guarantee" which the Second Circuit in *Greifinger* called the "safety exception".  *Greifinger, supra,* 97 F.3d at 704, citing *Sostre,* 442 F.2d at 186.

---

[2]  This case is distinct from a number of recreation cases in that Ziemba was permitted both outdoor exercise and recreation and the opportunity to exercise within his cell, while a more typical scenario is the plaintiff receiving no fresh air or insufficient out-of-cell time: *Williams v. Greifinger,* 97 F.3d 699 (2d Cir. 1996);  *Perkins v. Kansas Department of Corrections,* 165 F.3d 803 (10th Cir. 1999);  *Antonelli v. Sheahan,* 81 F.3d 1422, 1432 (7th Cir. 1995);   *Mitchell v. Rice,* 954 F.2d 187 (4th Cir. 1992);  *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir. 1979).

Courts outside the Second Circuit considering various exercise policies in correctional settings have recognized that "when reviewing Eighth Amendment claims, courts must consider the totality of the circumstances" including the penological justification for any given policy. *See, e.g., Mitchell v. Rice,* 954 F.2d 187, 191 (4th Cir. 1992), *cert. denied,* 506 U.S. 905 (1992). Courts have also frequently "concede[d] that penological considerations may, in certain circumstances, justify restrictions" on an inmate's ability to exercise freely out of doors." *Id.*, citing *Patterson v. Mintzes,* 717 F.2d 284, 289 (6th Cir. 1983).

It is the defendants' penological justification which distinguishes this case from *Williams v. Greifinger,* 97 F.3d 699 (2d Cir. 1996). In *Greifinger,* the Second Circuit held that New York's "medical keeplock" policy, which denied out-of-cell exercise to a non-violent inmate who declined a tuberculosis test, was unconstitutional. The case at hand involves a different sort of inmate, however, one who was not a generalized medical safety concern but one who had repeatedly proven his destructive, violent capacity within a general population correctional setting.

The *Turner v. Safley* test provides a useful framework for analyzing the policy at issue. 482 U.S. 78 (1987). Of course, in *Turner,* the Court listed four factors relevant to a determination of whether a correctional policy is reasonable:

(1)     whether there exists a valid, rational connection between the prison policy or regulation and the asserted government interest, and whether that interest is legitimate and neutral;

(2)     whether alternative means of exercising the denied constitutional right remain open to the inmate;

(3)     the impact accommodating the asserted constitutional right will have on staff, other inmates and prison resources; and

(4)     whether alternative means of regulating inmate behavior are readily available.

*Id.*

Applying these four factors supports the constitutionality of the policy at issue in this case.  Obviously, a valid, rational and legitimate government interest, and indeed obligation, exists for the defendants to maintain order given Phase I Administrative Segregation inmates' demonstrated history of violence.  Alternative means  for inmates to exercise exist, as inmates can exercise within their cells and still receive fresh air and out-of-cell time.  The impact of accommodating the asserted right would vary depending on the resulting incidents of abuse by Phase I inmates, which is difficult to determine, but the potential for violence and craftiness always exists in Phase I.  The last factor, alternative means of regulating inmate behavior, is difficult to apply—alternative means of regulating violent behavior, the threat of Disciplinary Reports and or Administrative Segregation, have already failed with these inmates.  Taking all four factors together, clearly no constitutional violation can be found in the policy at issue.

## 2.     __Qualified Immunity Applies__

Even were this Court to find that the former policy of recreating in restraints is unconstitutional, the defendants respectfully submit that they are entitled to qualified immunity on this issue.

The doctrine of qualified immunity protects government officials from civil suits arising from the performance of their discretionary functions when that performance "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982);  *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995);  *Oliviera v. Mayer,* 23 F.3d 642, 649 (2d Cir. 1994), *cert. denied,* 513 U.S. 1076 (1995).  This doctrine evolved as an accommodation between the need to provide private redress when government officials abuse their position of public trust and the need to shield

officials who responsibly perform their duties from the costs of defending an action. *Anderson v. Creighton,* 483 U.S. 635, 638-39 (1987); *Harlow v. Fitzgerald,* 457 U.S. at 814. Assertion of the privilege should be upheld unless the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 438 U.S. at 640.

In this case, the law was not clearly established that Northern's policy regarding Phase I Administrative Segregation inmates recreating in restraints was unconstitutional. Indeed, if any reasonable correctional officials in the defendants' position at the time could have believed that the policy was reasonable, then the defendants are entitled to qualified immunity. *Lennon v. Miller,* 66 at 422 (2d Cir. 1995). Not only might it be possible that reasonable correctional officials could differ as to the constitutionality of the policy, but several Connecticut courts have explicitly held the policy to be constitutional, thus it is incontrovertible that the defendants are entitled to qualified immunity on this point.

In *Caballero v. Warden,* a Connecticut Superior Court as recently as 2003 held that requiring inmates to wear restraints during outside-of-cell recreation does not violate the plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. *Caballero v. Warden*, 2003 Conn. Super. LEXIS 5, 2003 WL 139524 (Conn. Super. 2003) attached. In *Caballero*, the court held that "[t]he use of full restraints during the recreation period is, in this court's conclusion, reasonable force applied in a good faith effort to maintain discipline surrounding the petitioner, an individual who has proven his tendency to resort to violent behavior toward correction staff and other inmates." *Id.* at 3; *See also Tillman v. Warden*, 2003 Conn. Super Lexis 530 (February 26, 2003), attached ("The application of varying degrees of

restraint, depending on the A.S. level, does not involve the unnecessary and wanton infliction of pain, is not grossly disproportionate to the severity of the crime and is not excessive use of physical force against inmates."); *Cousineau v. Armstrong*, Ruling on Defendants' Motion for Summary Judgment, 3:95CV1084(AVC) (D. Conn. September 23, 1998) (holding that requiring inmates to wear restraints when outside their cells for showers and recreation "served the legitimate security function of maintaining prison order and preventing violence and therefore did not violate the plaintiff's Eighth Amendment rights.").

These recent cases cloak the defendants with qualified immunity with regard to the recreation policy at issue.

### C.  NO DELIBERATE INDIFFERENCE

#### 1.  No Denial of Medical Care

The Eighth Amendment protects inmates from deliberate indifference by prison officials to their serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). To prevail on such a claim, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. A prisoner must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. *See id.* at 104-105. Mere negligence will not support a section 1983 claim; the conduct complained of must "shock the conscience" or constitute a "barbarous act". *McCloud v. Delaney,* 677 F. Supp. 230, 232 (S.D.N.Y. 1988), *citing United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir. 1970). A defendant will be liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind." *Tomarkin v. Ward,* 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) *quoting Estelle,* 429 U.S. at 105-06.

The civil rights statute was not meant to redress medical malpractice claims that can be adequately resolved under state tort law. *Tomarkin,* 534 F. Supp. at 1230-31.[3]  Thus, a claim of misdiagnosis, faulty judgment, or malpractice, without more to indicate deliberate indifference, is not cognizable under section 1983. *See McNabe v. Nassau County Medical Center,* 453 F.2d 698, 704 (2d Cir. 1971); *Tomarkin,* 534 F. Supp. at 1230.  In addition, mere disagreement with prison officials about what constitutes appropriate medical care does not state a claim cognizable under the Eighth Amendment. *See Hyde v. McGinnis,* 429 F.2d 864, 868 (2d Cir. 1970);  *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir. 1972);  *Ross v. Kelly,* 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040 (1992).

There are both subjective and objective components to the deliberate indifference standard. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154 (1995).  The alleged deprivation must be "sufficiently serious" in objective terms. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991).  *See also Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, *J.*, dissenting: "'[The] serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain.").  The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment of treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (citation & internal quotations omitted).  In addition, where the denial of treatment causes plaintiff to suffer a

---

[3]      It is the position of the defendants that this cause of action would be insufficient even under a negligence standard, as the facts described above make clear.

permanent loss or life-long handicap, the medical need is considered serious.  *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir. 2000).

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate must also present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66 (citation omitted). "[A] prison official does not act in a deliberately indifferent manner unless that official *'knows of* and disregards an excessive risk to inmate health of safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (emphasis added) *(quoting Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

In this case, neither the objective nor the subjective tests are met.  The plaintiff claims that 11 of the defendants acted with deliberate indifference to his medical needs.[4]  First of all, the medical records in this case do not establish that the plaintiff's condition was "sufficiently serious."  Not a single doctor in the 8 different correctional facilities that plaintiff has been housed in here in Connecticut has ever stated that the plaintiff has a serious medical need with regard to his back nor did the unaffiliated doctor in Nevada conclude the plaintiff has a serious medical need related to his back.  **Ex. M.**  This is not for lack of testing or medical attention, as x-rays were ordered and the plaintiff has been seen numerous times over the years with regard to his back complaints.  Numerous medical personnel have stated that the plaintiff's objective symptoms do not comport with his subjective complaints, and the plaintiff has been accused of exaggerating his complaints to get stronger pain medication.  No medical personnel have ever

---

[4]    The defendants claimed to have denied the plaintiff adequate medical care are former Commissioner Armstrong, former Deputy Commissioners Tokarz and Matos, Majors Coates, Whidden and Lajoie, Captain Oglesby, Drs. Blanchette and Wright and Nurse Wollenhaupt.

stated that the plaintiff, with his two escapes, should be restrained in any special manner. The plaintiff has also received treatment for his back in that he has been monitored, has been x-rayed, and has received pain medications such as Tylenol and Motrin. There is simply no objectively serious medical condition that any of the defendants failed to perceive or were obligated to act on in any way.

Thus, as to all 11 defendants listed in footnote 3, the claim of deliberate indifference to a serious medical condition fails, and summary judgment should be entered in the defendants favor on this claim.

### 2.    No Conspiracy to Deprive Plaintiff of Medical Care

In addition, the plaintiff's claims of deliberate indifference to serious medical needs as to all the defendants are so vague and conclusory as to be laughable. The plaintiff implies without any supporting allegations that the defendants somehow collaborated to cuff him in back, the standard policy for Phase I Administrative Segregation inmates, knowing it would somehow hurt him in some unique sense. The plaintiff does not allege how this conspiracy took place. The plaintiff's allegations that the defendants ignored his serious back problems are simply weak allegations of conspiracy. As this Court is aware, the Second Circuit "has repeatedly held that complaints containing only conclusory, vague or general allegations of a conspiracy to deprive a person of his constitutional rights will be dismissed. Diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ostrer v. Aronwold,* 567

F.2d 551, 553 (2d Cir. 1977) (internal quotes, cites omitted).[5]  Thus, since the plaintiff has

nothing to support his wild claims of conspiracy, the defendants, are entitled to summary

judgment to the extent conspiracy is alleged.

> **3.      Custodial Defendants Entitled to Rely on Medical Staff**

Although the plaintiff feels that he should have received different medical treatment than

the treatment medical staff provided to him, it cannot be disputed that he did in fact receive

medical care on a frequent basis for a variety of issues including his back while he was

incarcerated.  The custodial defendants[6] are entitled to defer medical judgments to medical

professionals, and the Constitution does not require that they second-guess such professionals.

*See, e.g., Waples v. Kearney,* 2001 U.S. Dist. LEXIS 9050 (D. Del. 2001), attached;  *Cross v.*

*Ayers,* 1998 U.S. Dist. LEXIS 16546 (N.D. Cal. 1998), attached.  "Prison administrators …

cannot be found deliberately indifferent for failing to defer to an inmate's judgment about

appropriate diagnostic care" when medical professionals are providing an inmate care and

making alternative decisions about that care."  *Fillerbrown v. Zettlemoyer,* 1996 U.S. Dist.

LEXIS 11495 (D. Penn. 1996), attached, citing *Estelle v. Gamble,* 429 U.S. at 107;  *Durmer v.*

*O'Carroll,* 991 F.2d 64 (3d Cir. 1993).  When custodial staff's participation in the medical care

of an inmate is "remote" and "attenuated", a claim for deliberate indifference fails.  *Miltier  v.*

*Beorn,* 896 F.2d 848, 855 (4th Cir. 1990); *Rogers v. Evans,* 792 F.2d 1052, 1059  (7th Cir. 1986).

One Court has stated, "*Miltier* has stated, and common sense confirms, that [a Warden's]

---

[5]      *See also Cambriello v. County of Nassau,* 292 F.3d 307, 324 (2d Cir. 2002); *Koch v.*
*Yunich*, 533 F.2d 80, 85 (2d Cir. 1976) ("Complaints relying on the civil rights statutes
are    plainly insufficient unless they contain some specific allegations of fact indicating a
deprivation of civil rights, rather than state simple conclusions."

reliance [on medical professionals] cannot amount to deliberate indifference." *Coppage v. Mann,* 906 F. Supp. 1025 (E.D.Va. 1995).

When in this district, Judge Cabranes ruled, "[A]s a prison administrator, [the] Warden … justifiably may defer to the medical expert[s] regarding treatment of inmate/patients." *Liscio v. Warren,* 718 F. Supp. 1074, 1082 (D. Conn. 1989), *reversed on other grounds,* 901 F.2d 274 (1990), *citing, McEachern v. Civiletti,* 502 F. Supp. 532, 534 (N.D.Ill. 1980)(reliance upon opinion of medical staff as to proper course of treatment insulates prison administrator from liability under the Eighth Amendment).  This is especially so when prison administrators do not have the authority to order surgery or other sought-after treatment. *Gomm v. DeLand,* 729 F. Supp. 767, 781 (D. Utah 1990).

In this case, comprehensive medical and mental health care were being provided to the plaintiff.  **Ex. M.**  The plaintiff cannot show that the custodial staff in this case had any reason to doubt the care being provided to him when the plaintiff made visits to the medical unit constantly and received all sorts of care and medicine on a consistent basis.  None of the custodial defendants were deliberately indifferent to the plaintiff's medical needs.

   **4.**     <u>**Insufficient Personal Involvement in Claimed Lack of Medical Care**</u>

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected,' the complainant to a deprivation of rights secured by the Constitution and laws." *Rizzo v. Goode* 423 U.S. 362, 370-71 (1976), *quoting* 42 U.S.C. §1983.  Where damages are sought in a §1983 action, the defendant(s) must be responsible for the alleged constitutional deprivation.  Thus, an allegation of personal involvement is a necessary prerequisite for a valid cause of action under

---

[6]     Armstrong, Tokarz, Matos, Myers, Coates, Lajoie, Whidden and Oglesby.

§ 1983.  *See, e.g., Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987); *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973), *rev'd on other grounds, Graham v. Connor*, 490 U.S. 386 (1989); *McKinnon v. Patterson*, 568 F.2d 930 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978).  Consistent with the requirement that personal involvement is required for a claim under § 1983, the Supreme Court has ruled that the general doctrine of *respondeat superior* does not suffice to state a claim under § 1983.  *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 692-95 (1978).  Thus, in order to state a cognizable claim, the plaintiff must allege, and ultimately prove, "personal involvement of [the defendants] sufficient to support their liability for wrongful acts," not merely their "linkage in  the chain of command." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985).

Supervisory responsibility alone is not enough to confer exposure to liability.  *Williams v. Smith*, 781 F.2d 313, 323 (2d Cir. 1986); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir. 1974).  A supervisory official may only be liable if it is alleged that he or she learned of the violation and failed to remedy the wrong, if he created or permitted the policy or wisdom under which the unconstitutional practices occurred, or if he was grossly negligent in managing subordinates who caused the violation.  *Williams v. Smith,* 781 F.2d at 323-24; *Meriwether v. Coughlin,* 879 F.2d 1037 (2d Cir. 1989).  "A plaintiff must thus allege a tangible connection between the acts of the defendants and the injuries suffered."  *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986).  For example, an official cannot be held liable merely because he or she occupies a high position in the prison hierarchy.  *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995).

In this case, Nurse Wollenhaupt merely answered the plaintiff's grievances, but as the plaintiff's medical history demonstrates, she did not have sufficient personal involvement in the

decision-making regarding plaintiff's health care that she should be held liable even in the unlikely event that the Court finds a constitutional violation with regard to medical care. Dr. Wright examined, diagnosed, and cared for the plaintiff only once, and did so appropriately. As the medical history demonstrates, medical care providers such as APRN Katz-Feinberg, Nurse Clark and others were largely responsible for the plaintiff's healthcare for his back. Dr. Blanchette was not personally involved in the plaintiff's medical care, and thus cannot be held liable for any perceived deficiencies therein. None of the custodial defendants were personally involved in the plaintiff's medical care.

Accordingly, all claims regarding plaintiff's medical care and the lack of medical input ordering or requesting that the plaintiff be handcuffed in the back are insufficient for lack of involvement on the part of the defendants.

### 5.     Neither Excessive Force Nor Failure to Stop Such Force

Without alleging times, dates, or even names, the plaintiff alleges that he was the subject of excessive force which injured him "horribly, grotesquely and painfully". Thrd. Amd. Com. ¶¶ 49-52. These claims seem to be related to the handcuffing in the back. He further claims that a conspiracy and failure to protect him from being handcuffed in the back. The defendants are not even able to respond to these vague and conclusory allegations, and summary judgment should enter in their favor on all of plaintiff's claims of excessive force.

Even were the plaintiff's allegations sufficiently specific, the plaintiff has not alleged sufficient personal involvement, nor has he sufficiently alleged conspiracy to use excessive force by the defendants or anyone in concert with them, and thus his claims fail as a matter of law.

III.     **CONCLUSION**

Judgment should enter in favor of all defendants for all of the reasons set forth above.

DEFENDANTS,
John Armstrong, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:____/s/_____
Lynn D. Wittenbrink
Assistant Attorney General
Federal Bar No. ct08575
110 Sherman Street
Hartford, CT  06105
Telephone No.  (860) 808-5450
Fax No. (860) 808-5450
lynn.wittenbrink@po.state.ct.us

**CERTIFICATION**

I hereby certify that a copy of the foregoing has been sent, first class postage prepaid, this

12th day of September, 2005, to

Duane Ziemba, 128963
Garner Correctional Institution
50 Nuunawauk Rd.
P.O. Box 5500
Newtown, Ct  06470



____/s/_____
Lynn D. Wittenbrink
Assistant Attorney General