UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Duane Ziemba | : | PRISONER |
| | | 3:02CV02216(DJS) |
| v. | : | |
| John Armstrong, et al | : | September __, 2005 |

### AFFIDAVIT OF CAPTAIN JAMES M. SHEA

The undersigned hereby deposes and says:

1. I am over the age of 18 and understand and believe in the obligations of an oath;

2. I am currently a Correctional Captain at Northern Correctional Institution (hereinafter "Northern"). I have held this position since October, 1999. Before that, I was a Correctional Lieutenant and a Correctional Officer. Altogether, I have 19 and one half years of correctional experience. As such, I am familiar with the facts of this case.

3. Inmate Ziemba has been and continues to be within the custody of the Commissioner of Correction. To say that the plaintiff has been a management problem for DOC officials would be an understatement. The plaintiff has received 62 Disciplinary Reports during his incarceration.

4. The combination of Ziemba's repeated disciplinary problems while at Northern in Phase I of Administrative Segregation resulted in the plaintiff's continued confinement in Phase I of the Administrative Segregation program at Northern.

5. Northern was at the time in question and is now the designated restrictive housing facility for the Connecticut Department of Correction, managing those inmates who have

demonstrated a serious inability to adjust to confinement in prison and pose a serious threat to the safety and security of a correctional facility.

6. Placement in the Administrative Segregation Program at Northern both in 1999 and since then comes after a hearing, and the decision of the Hearing Officer may be appealed.

7. Since 1999, the Administrative Segregation Program has consisted of a three phase program.

8. The Administrative Segregation Program "operates on the basic assumption that inmates who engage in aggressive, violent, disruptive behavior, or who pose an imminent risk ... require a highly structured and secure environment."

9. In Phase I, which at the time lasted for at least six months if an inmate was discipline free, or longer if not, inmates are allowed very little time out of their cells. Meals are eaten in the cells; inmates are restricted to three showers and five hours of recreation per week.

10. While he was housed in Phase I of the Administrative Segregation program at Northern, the plaintiff was housed in Units One West and One East. While in Phase I, the plaintiff typically shared a cell with another inmate.

11. The size of the double cell that the plaintiff shared while in Phase I was approximately 8 by 10 feet, containing nearly 80 square feet. The cell contained two narrow beds one over the other, and a toilet.

12. Recreation in Phase I was and is provided for one hour per day five days per week, but is entirely voluntary.

13. It was the policy at Northern up until April of 2003 that inmates in Phase I of the Administrative Segregation program, no matter the length of time they had been in Phase I, were required to participate recreation in full restraints for the entire duration of their stay in Phase I.

14. This is still the policy for inmates who have initially been placed in Phase I of the Administrative Segregation program at Northern, although the policy has been changed so that the rule regarding recreating in restraints *may* be relaxed after 30 days under certain conditions.

15. For his one hour of recreation five days per week, a Phase I inmate is escorted in full restraints into an outdoor recreation area surrounded by a chain link fence. The inmate remained in full restraints for the duration of the hour, and then was escorted back to his cell.

16. The inmate is free to walk and move about the recreation area in the fresh air, and inmates recreating in this manner usually spend most of the time walking around. The recreation yard is approximately 20 by 20 feet.

17. Full restraints within the Connecticut Department of Correction includes handcuffs behind the back, leg irons, and a tether chain from the leg irons to the handcuffs.

18. While the restricted conditions of recreation for a Phase I Administrative Segregation inmate are a far cry from the basketball, television, volleyball and other indoor and outdoor recreational activities available to Connecticut's general population inmates at the time and currently, these measures were considered necessary due to the security threat posed by Phase I inmates given their behavior resulting in placement in Phase I.

19. Inmates who have shown a propensity for violence against correctional staff or other inmates within a correctional setting have been can be ingenious in their destructiveness.

20. They can hold trap doors open while unrestrained, they can swing handcuffs around after the first one is applied to one hand, and they refuse to re-cuff, among other things, all of which can disrupt the daily routine of a facility.

21. During the time period in question, inmates in Phase I of the Administrative Segregation were required to recreate in restraints for reasons of safety and security. Inmates in Phase I Administrative Segregation both now and during the time in question are not, however, restrained during the time that they spend inside their cell.

22. The cells at Northern are large enough to accommodate calisthenics such as sit-ups, push-ups, jumping and running in place.

23. The policy of recreating Phase I Administrative Segregation inmates at Northern in restraints while they could do more intensive calisthenics in their cell accommodated both the inmates' needs for fresh air, walking, and time out of their cell while allowing the inmates' needs for more vigorous exercise, if they chose to engage in it, to be accomplished within the confines of their cell.

I swear that the foregoing is true and accurate to the best of my knowledge and belief.

_____
James M. Shea

Subscribed and sworn to before me this ___6th___ day of September, 2005.

_____
Commissioner of the Superior Court/
Notary Public
Commission expires ___