## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DUANE ZIEMBA                 :       PRISONER

                               :       NO. 3:02CV02216(DJS)

       VS.                        :

                               :

JOHN ARMSTRONG, ET AL.       :       SEPTEMBER 9, 2005

### AFFIDAVIT OF EDWARD BLANCHETTE, MD

The undersigned hereby deposes and says:

1.    I am over the age of 18 and understand and believe in the obligations of an oath:

2.    I am a physician licensed to practice medicine in the State of Connecticut since 1975.

3.    I completed my residency in medicine at Saint Francis Hospital, Hartford, Connecticut, in 1977, and completed a Fellowship in Infectious Disease and Microbiology from the University of Connecticut School of Medicine in 1979.

4.    I have held various positions with the State of Connecticut Department of Correction (hereinafter "DOC") since 1984, including Hospital Clinical Director at Osborn Correctional Institution, Medical Director at the MacDougall Correctional Institution (hereinafter "MacDougall"), and Acting Director of Health Services and Clinical Practice Coordinator. I am currently the Director of Professional and Clinical Services for the Department of Correction.

5.    I am familiar with the medical care and treatment provided to the plaintiff in this case, Duane Ziemba, having reviewed his health record, consulted with Dr. Wright and having reviewed his care on previous occasions.

6.    Plaintiff's medical records do not indicate any significant problem with plaintiff's back.

7.    In March of 1998, long before his placement at Northern, yet while in custody, plaintiff's back was x-rayed twice with two different views after an altercation with an officer, and other x-rays to rule out back problems followed.   **Ex. M, 190, 191, 192, 222, 224, 311, 313, 315.**

8.    The conclusion reached by one radiologist was "Minimal anterior wedging of what appears to be T7, ? old Scheuermann's disease." **Ex. M 190.**  Scheuermann's disease is a condition formed during growth years when the front of a disc or discs in the back do not grow at the same pace as the back.

9.    The radiologist reading the report also said that the *minimal* wedging he noted could also be the product of trauma.  **Ex. M 190.**  Earlier that same month, another radiologist reported that several "views of the lumbosacral spine reveal no evidence for acute fracture or dislocation.  No subluxation is evident." **Ex. M 191.**

10.   Also on that date the radiologist concluded "No acute abnormality of the lumbosacral spine." **Ex. M 192.**  He also noted *"mild"* narrowing at the cervical portion of the plaintiff's spine, but again concluded, "No acute fracture, subluxation or dislocation evident." **Exs. M 192; N.**

11.   In April of 1998, approximately one month later, additional x-rays of the plaintiff's back (and sinuses) were taken. **Ex. M 189.**  The conclusion again with regard to the Thoracic spine was "No significant interval change". **Ex. M 189.**

12. In May of 1998, a doctor ordered x-rays of plaintiff's back and the plaintiff complained about the x-rays. **Ex. M 222.** The plaintiff argued with medical staff that month, May of 1998, about the cause of his alleged back problems. **Ex. M 221.**

13. The plaintiff's doctor noted in May of 1998 that there were no acute changes on spinal x-rays but that the plaintiff was "unsatisfied with NSAID [anti-inflammatory medicine; Motrin] and bedrest." **Ex. M 224, 228.**

14. The treatment plan for plaintiff at that time was to continue conservative management and seek an orthopedic consult if an "adverse clinical change occurred." **Ex. M 224.**

15. The reporting doctor indicated with regard to the plaintiff, "He feels pain is being ignored. Litigation is highly likely." **Ex. M, 228.**

16. In June of 1998, plaintiff complained to medical staff, "You had x-rays of my back taken and told me they show nothing wrong. I am again telling you something is seriously wrong." **Ex. M 217.**

17. Medical staff responded that the plaintiff had been seen 5 times from March to May of 1998 and had as of the last visit reported being comfortable after Motrin. **Exs. M 217.**

18. None of the custodial defendants were involved in any decisions regarding treatment for the plaintiff's alleged back pain during the time period in question. The defendant Dr. Wright did treat the plaintiff on one occasion, as described below. Although Nurse Wollenhaupt did respond to many of plaintiff's written requests regarding his alleged back pain and other issues by noting that the plaintiff had been seen by a doctor regarding this alleged pain, she did not make medical decisions regarding the plaintiff's treatment for his back. **Exs. M 218,**

220, 221, 222, 223, 236, 238, 23, 240, 241, 242, 248, 249, 250, 251, 252, 253, 254 259, 273, 288, 289.

19.    While there is certainly ample evidence that plaintiff complained about a back problem in 1998 and thereafter, there is likewise ample documentation that plaintiff was seen and treated for his alleged back problems by medical staff, that his problem was not ignored, Motrin and Tylenol were prescribed, and no acute or serious back injury was ever determined to exist. **Exs. M 189, 190, 191, 192, 217, 218, 220, 221 222, 223, 228, 232, 236, 238, 239, 240, 241, 242, 248, 249, 250, 251, 252, 253, 254, 259 273, 288, 289, 301.**

20.    In terms of plaintiff's condition as perceived by medical staff, aside from his verbal complaint, the following was noted:

> No change in x-ray findings.
> Lumbar spine, no vertebral tenderness
> No limp in walk
> Lumbar pain L [left] sided more than thoracic spine level pain

**Exs. M 304.**

21.    These objective findings do not support plaintiff's claims about a serious back condition being mistreated by the application of restraints in the back. Indeed, handcuffing a person in the back stretches the front, chest muscles, but would have no impact on the back one way or another.

22.    On April 20, 1998, while at MacDougall-Walker Correctional Institution, the plaintiff wrote an Inmate Request Form in which he stated, "I refused a medical trip today because my back seriously hurts. It is not humane for belly-chains to be raped [sic] around my back with padlock behind my back. I was 3:00 AM forced to refuse trip for this reason. I am

4

trying to heal not be hurt worse. Can this be rescheduled with restraints being used <u>anyway</u> but raped [sic] around my back.?" **Ex. M 253.**

23,    Nurse Wollenhaupt stated to the plaintiff in response to his requests that, "Unfortunately, we can not deviate from the Administrative Directive. You have no gross documented anomalies of the back. We will try to rebook it if you agree to go according to the Administrative Directive." **Ex. M 253.**

24.    In May of 1998, Dr. Silvis, not a defendant in this matter, noted the plaintiff, still at MacDougall, was "Upset because I noted in chart he refused to go to UCONN wearing certain restraint—This is simply a well documented fact that can not be covered-up to help I/M [inmate] Ziemba in his personal use of his medical file." **Ex M 296.**

25.    The doctor further noted on that date that he had requested an orthopedic visit for the plaintiff "because unsatisfied." **Ex. M 297.**

26.    The doctor further noted, "Back pain complaints have been on-going since initial assault. No change in x-rays c/ [with] no fx [fracture] ever seen." **Ex. M 297.**

27.    On a separate occasion in May of 1998, the plaintiff indicated to other medical staff that "He had not issues about the restraints except that he asked custody staff to be 'reasonable'" **Ex. M 301.**

28.    While in April of 1998, medical staff felt the plaintiff might have experienced a muscle spasm in his back. Staff charted that the plaintiff himself aggravated this by working out. **Ex. M 307.**

29.    Medical staff prescribed Motrin and Naproxen for plaintiff's pain from April through July of 1998. **Ex. M 390-392.**

30.    In August of 1998, the plaintiff's back was functioning well enough that he was able to rip the toilet off of the floor or wall of his cell at Garner, break a fixture in the ceiling and crawl up into the ceiling. **Ex. M 355, 540, 541.**

31.    At this point in time, the plaintiff was restrained and medical staff checked on him frequently, typically every two hours. **Ex. M 492-502.**

32.    During all of these checks, the plaintiff made no complaints of back pain, and medical staff noted on more than one occasion, "No c/o [complaints of] discomforts and no obvious s/s [signs or symptoms] of distress." **Ex. M 492-502.**

33.    On September 8, 1998, plaintiff complained to staff that his back was not getting better and he was referred to "Sick Call" -- how inmates make an appointment. **Ex. M 485.**

34.    Also in September of 1998, another x-ray was taken of plaintiff's back. **Exs. M 517.** The results were provided by UConn radiology, which noted, "Some degenerative changes, no acute disease." **Ex. M 517.**

35.    Clinical notes from September 11, 1998, reflect an extensive exam of plaintiff's complaints as related to his back vis-à-vis objective factors related to back pain. **Exs. M 519, 520.**

36.    Seeing Nurse Clark, the plaintiff complained as follows:

C/O [complains of] back pain since August 12th – c/o lower back pain that goes down my right leg. I/M states previous hx [history] of back problems c/ [with] hospitalization for back on March of 1998. **Ex. M 520.**

37.    Obviously, this was a fabrication as the plaintiff's records from 1998 do not support any such "hospitalization for back on March of 1998." **Ex. M 190-220.**

38.    Indeed, the plaintiff's report of a back injury in 1998 was contradicted by his statement to Nevada medical personnel in 2000 that he had a "Back injury prior to incarceration." **Ex. M 1115.**

39.    Nurse Clark further noted in September of 1998: "gait observed steady;  I/M slowly becoming verbally aggressive and demanding stating that he needs to be cuffed in front because he is 'so tall and my back hurts.'" **Ex. M 520.**

40.    The plaintiff wanted to be cuffed in front a month after destroying a cell and mechanical restraints. **Ex. M 253.**

41.    Nurse Clark noted as follows:

Sick call process explained to i/m [inmate] and his hx [history] of refusing to see the MD also discussed c/ i/m [with inmate].  No obvious distress or extreme discomfort noted; I/M denies being able to bend over to remove his sock for nurse to examine foot however custody staff reports that I/M is able to dress self and tend to … [illegible] c/ [with] no requests of assistance;
As stated, inmate denies exercising in cell but muscle tone noted to be good;
I/M also initially stated that he was unable to move his toes but then stated he could move them;  I/M noted to be able to propel body on and off exam table s/ [without] assistance and no c/o [complaints of] discomforts.    I/M noted to bend at waist to sign inmate fee form c/ [with] no c/o [complaints of …]. **Ex. M 519.**

42.    Nurse Clark concluded as follows: "P) [Plan:]  Continue c/ [with] cuff status in back per custody protocol." **Exs. M 519.**

43.     In late September of 1998, the plaintiff engaged in behavior unlikely for someone with severe back pain, leading correctional staff to extract him from his cell. **Ex. M 483.**

44.     At this point in time, the plaintiff complained of "internal bleeding" which was never substantiated, but did not complain of back problems and "denie[d] any other medical concerns/issues." **Ex. M 483, 484.**

45.     In October of 1998, the plaintiff complained of several issues, including his back. **Ex. M 515.** Medical staff noted at that time that the plaintiff had "full mobility, able to amb[ulate] c/o [without] difficulty, [Zero] s/o [signs of] trauma." **Ex. M 515.**

46.     The plaintiff was given Motrin at this time. **Ex. M 515.**

47.     In February of 1999, the plaintiff complained of back pain and was seen by medical staff. **Ex. M 518.** Staff referred the plaintiff to the September 1998 x-rays, and the plaintiff requested follow-up x-rays, and was referred to "MDSC", sick call with a doctor. **Ex. M 518.**

48.     On March 4-5, 1999, the plaintiff was again in four-point restraints and thus assessed by medical staff at Northern. **Ex. M 456, 458.**

49.     The plaintiff did complain of lower back pain at this time, on some of the medical checks he received, along with numerous other issues, although he did not always complain of back pain at this time. **Ex. M 456-467, 476-477.**

50.     On March 9, 1999, the plaintiff had a physical incident with correctional staff after refusing an order and several medical issues were reported, none of which included his back. **Ex. M 422.**

51.    The lengthy medical chart reveals that he was seen frequently by various medical staff, including doctors, nurses and other professional on a frequent basis.  **Ex. M.**

52.    Nurse Wollenhaupt was certainly entitled to rely on the assessments of various medical staff, and as a nurse responding to grievances or referring the plaintiff to a doctor or APRN, was not in a position to second-guess the orders or assessments of physicians or other medical personnel who had physically examined the plaintiff.

53.    A review of the plaintiff's medical records reveals no objective back injury or any clinical reason to handcuff him in front.  **Ex. M.**

54.    The alleged back pain does not constitute a "serious medical condition".  **Ex. M.**

55.    In Nevada, the plaintiff's complaints about his back pain primarily occurred in the year 2000, two years prior to his return to Connecticut in 2002.  **Ex. M 1052, 1053, 1064, 1065, 1068, 1069, 1134.**

56.    At the plaintiff's Intake Physical Examination in Nevada on February, 2000, he reported that his spine was "abnormal".  **Ex. M 1030.**  Objectively, the examiners findings on that date were that his everything was "NL", or, within normal limits.  **Ex. M 1030.**

57.    Two years later, at his biennial physical on February 25, 2002, the plaintiff's spine was reported to be "normal".  **Ex. M 1029.**

58.    Nevada prison officials had x-rays of the plaintiff's back performed in 2000.  **Ex. M 1083-86.**  No Nevada medical care provider ever opined that the plaintiff should only be handcuffed in the front.  **Ex. M.**

59.    One care provider noted in June of 2000 with regard to the plaintiff's back pain, "Subjective complaints only—no objective physical exam findings."  **Ex. M 1135.**

60.    During the time period he was at Cheshire from March to May of 2002, the plaintiff complained only once of low back pain, and did not request that Cheshire medical staff issue an order that he only be handcuffed in the front. **Ex. M 1272.**

61.    Reportedly, the incident that lead to the plaintiff's placement at Northern on this occasion was him flooding his cell and "banging on [the cell] door with extreme force" then subsequently breaking his restraints **Ex. M 1269, 1366.**

62.    The stated back injury is inconsistent with using an arm to bang on a cell door with extreme force.

63.    Upon his initial placement at Northern, the plaintiff made no complaint of any back discomfort. **Ex. M 1261-1270.**

64.    In June of 2002, the plaintiff's back was x-rayed based on a referral by Dr. Pesanti and APRN Katz-Feinberg when the plaintiff complained of back pain on June 7, 2002. **Ex. M 1182, 1260.**

65.    The conclusion of the UCONN radiologist was the plaintiff has "mild diffuse degenerative arthritis." **Ex. M 1182.** This is an extremely common diagnosis, which in the plaintiff's case in no way necessitates the plaintiff being handcuffed in the front and which in the plaintiff's case does not constitute a serious medical condition.

66.    On July 12, 2002, the plaintiff reported to the medical unit and saw the defendant Nurse Wollenhaupt. **Ex. M 1257.** All that Nurse Wollenhaupt did at this visit was refer the plaintiff to a doctor or APRN. **Ex. M 1257.**

67.    Nurse Wollenhaupt did not make any decision at the time with regard to the plaintiff's healthcare other than the referral, which was appropriate, and the plaintiff was indeed seen three days later by APRN Katz-Feinberg. **Exs. M 1257**

68.    Katz-Feinberg, who is not a defendant in this matter, made the following notations in plaintiff's health record regarding his back:

S [subjective]:  C/O [complains of] continued back pain.

O [objective]:    Mobility—able to get on/off exam table c/out

[without] difficulty, on/off chair—gait stable

A [assessment]:    **Stated** back pain.

**Ex. M 1257.**

69.    Katz-Feinberg prescribed Naproxen for the stated back pain of the plaintiff.  She did not address the issue of plaintiff's claim in this lawsuit that it was medically necessary for him to be handcuffed in the front of his body as opposed to the back. **Ex. M 1257.**

70.    The care the plaintiff received from both Wollenhaupt and Katz-Feinberg was appropriate and well within the standard of care.

71.    In September of 2002, the plaintiff filed an Inmate Request form at Northern in which he stated, "Again, please immediately have the doctor order for custody staff to stop handcuffing me behind my back.  Because it's seriously re-injuring my back.  And denying me recreation." **Ex. M 1211.**

72.    The plaintiff had filed a similar request only three days earlier.  **Ex. M 1212.** Both requests were responded to simultaneously and appropriately. **Exs. M 1211, 1212**

73.    Nurse Wollenhaupt, who was not making decisions about the plaintiff's healthcare but who responded to his grievances noted correctly, "There is no medical contraindication to cuffing in the back. If anything, there would be an extension of the chest muscle not the back muscle. **Ex. M 1211.**

74.    Nurse Wollenhaupt also responded, "There is no medical problem that would interfere with cuffing in the back after three years." **Ex. M 1212.** This was an appropriate response by Nurse Wollenhaupt.

75.    On November 1, 2002, the plaintiff reported to a nurse in the medical unit that his back was "seriously hurting" him. **Ex. M 1256.** The Registered Nurse evaluating him noted at the time that, despite his claims, the plaintiff ambulated within normal limits and was able to get in and out of the chair within normal limits. **Ex. M 1256.**

76.    Nonetheless, as had Nurse Wollenhaupt before her, this nurse referred the plaintiff to a doctor or APRN. **Ex. M 1256.**

77.    Notwithstanding what he alleged to be a serious back condition on November 1, 2002, the plaintiff was able on November 5, 2002 to destroy the handcuffs he was wearing while on "in cell restraint status" for flooding his cell, a disciplinary status during which he was restrained within a cell. **Ex. M 120, 1257, 1242-43.**

78.    He then reportedly became combative with staff when they intervened. **Ex. M 1202.** APRN Katz-Feinberg reported that the plaintiff "was trying to get out of his handcuffs and twisted open his cuffs in his bed frame injuring his wrists." **Ex. M 1242-43.**

79.    Katz-Feinberg did not order nor recommend any special handcuffing procedure at this point in time, nor was any such order or recommendation warranted. **Ex. M 1242-43.**

80.     In early December of 2002, the plaintiff received correspondence from then Deputy Commissioner Tokarz "in response to your letter regarding pain in your back and related to handcuffing behind your back." **Ex. M 1197.**

81.     Medical staff was aware that plaintiff felt this was an issue, and the correspondence indicates the concern was being evaluated and addressed. **Ex. M 1197.**

82.     On December 19, 2002, the defendant Dr. Wright diagnosed the plaintiff as having "DJD", or degenerative joint disease, in his back. **Ex. M 1230.**

83.     Degenerative joint disease, also known as osteoarthritis, is the most common form of arthritis, affecting tens of millions of adults in this country.

84.     In diagnosing the plaintiff, Dr. Wright examined the plaintiff's x-ray reports from June of 2002, conducted a physical exam, and listened to the plaintiff's reported symptoms. **Ex. M 1230.** He then prescribed Naproxen. **Ex. M 1230.**

85.     Dr. Wright did not issue an order or recommendation that the plaintiff be handcuffed in the front, nor was one medically indicated or even advisable. **Exs. M 1230.**

86.     Dr. Wright treated the plaintiff's common condition in an entirely appropriate manner well within the applicable standard of care.

87.     There was no medical necessity or reason to handcuff the plaintiff in the front as opposed to the back from May of 2002 though April of 2003 or at any time before or after that.

88.     The plaintiff has received appropriate, professional health care for his back throughout his tenure as an inmate and all such care has been well within the applicable standard of care.

_Edward Blanchette, MD_

Edward Blanchette, MD

Subscribed and sworn to before me this ___9th___ day of September, 2005.

_Lynn D. Wittenbrink_
Lynn D. Wittenbrink
Assistant Attorney General

14