UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DUANE ZIEMBA              :        PRISONER
                         :        NO. 3:02CV02216(DJS)
        VS.              :
                         :
JOHN ARMSTRONG, ET AL.   :        SEPTEMBER 12, 2005

STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1.      The plaintiff has been in and out of the custody of the Department of Correction (hereinafter "DOC") for many years.  **Ex. A DOC RT 60 Screen.**   The plaintiff first entered prison in 1984 and began increasingly longer periods of incarceration thereafter.  **Ex. A.**

2.      In 1997, the plaintiff escaped from DOC custody while on Community Release status, and was subsequently returned to the custody of the Department of Correction with additional charges including larceny.  **Exs. A; E Inmate Master File portions; R Transport Request Package.**

3.      Since 1997, Ziemba has continuously been in the custody of the Connecticut Commissioner of Correction.  **Ex. A.**   His current sentence does not expire until June of 2013, however he has recently been paroled effective in March of 2006.  **Exs. C, RT 50 screen; B, RT 51 screen.**

4.      To say that the plaintiff has been a management problem for DOC officials would be an understatement.   The plaintiff has received 62 Disciplinary Reports during his incarceration.  **Exs. D, RT 67; A.**

5.      The plaintiff's disciplinary history includes being found guilty by the Department of Correction of Assault on a DOC employee, three charges of Attempted Assault on a DOC

employee, fighting, numerous times being found guilty of threats, numerous times being found guilty of interfering with safety and security, and attempted escape in an incident separate from his escape from Community Release.  **Exs. A; D; E.**

6.     The plaintiff's initial terms of incarceration from 1984 until 1997 were relatively calm.  **Exs. A; D.**   Despite serving 5 separate periods of incarceration prior to being returned from his escape from Community Release in 1997, with those five separate periods totaling approximately six years and 9 months, the plaintiff received only 7 Disciplinary Reports prior to September of 1997.  **Exs. A; D.**

7.     In September of 1997, while housed at Cheshire, the plaintiff incurred Disciplinary Reports for fighting and Interfering with Safety and Security.  **Exs. A; D.**  On this date, the plaintiff refused to exit the shower and barricaded the shower entrance with plastic chairs.  **Ex. E, 139; F, Administrative Seg. file.**

8.     At this point, the plaintiff was temporarily transferred to Northern for a period of little over a month then back to a lower security level facility.  **Ex. A.**   While at Northern, the plaintiff received a hearing regarding placement in Administrative Segregation ("AS") at Northern, and his placement at Northern at that time was not authorized.  **Ex. E.**

9.     The plaintiff was warned at this point in time however, that "any additional Disciplinary Reports would result" in a review of his status.  **Exs. E 139; F.**  The plaintiff then started regularly incurring Disciplinary Reports at various facilities, garnering 10 Disciplinary Reports in a period of 7 months.  **Exs. A; D.**

10.     On August 11, 1998, the plaintiff attempted to escape, destroying the ceiling to his cell at Garner by kicking it and tampering with a fixture in the ceiling as well flooding the

cell and ripping the toilet out of the floor and using pipes from the toilet to hit the window to the cell.  **Exs. D, E 139; F; M 524.**

11.     The plaintiff had previously received criminal charges for a different escape, ultimately resulting in time being added to his term of incarceration.   **Ex. L, Transfer Request Package.**

12.     On the same day he destroyed the ceiling, 8/11/98, the plaintiff was again transferred to Northern.   **Ex. A.**   Despite being placed in the Phase Program at Northern in an effort to control his behavior, the plaintiff continued to be a management problem.  **Ex. E.**

13.     The plaintiff continued to receive numerous Disciplinary Reports and sanctions at Northern throughout the remainder of 1998 and through 1999.  **Exs. D, E.   186-243.**   In November of 1998, the plaintiff was sentenced to a much longer sentence than previously, which certainly did not positively impact his institutional behavior.  **Exs. A; E 244; G 3/31/99 Letter from Dudley to Levesque.**

14.     In September of 1999, the plaintiff had another significant incident, and was internally charged with and convicted of multiple counts of Attempted Assault on an Officer as well as other charges.  **Exs. D; E, 186-207.**

15.     During this incident the plaintiff swung at Correctional Officers despite being restrained and was spitting.  **Ex. E 198, 204.**

16.     The plaintiff proved adept at slipping his restraints, including handcuffs, having to have them applied multiple times, breaking them on at least one occasion and attempting to break them on another.  **Ex. E 186, 187.**

17.    As he did so frequently, the plaintiff fought his disciplinary charges, pleading not guilty and appealing them all, typically accusing staff of a variety of improper behavior.  **Ex. E, 186-207.**

18.    The plaintiff garnered yet another ticket in October of 1999 on a charge he incurred frequently, Interfering with Safety and Security   **Ex. D.**  Three months later, on January 20, 2000,  the plaintiff was transferred to Nevada under the prisoner exchange program.  **Ex. A.**

19.    The plaintiff was ultimately transferred back to Connecticut on March 28, 2002 and was initially placed at Cheshire Correctional Institution.  **Ex. A.**  The events precipitating Ziemba's return to Northern two months later were as follows.  **Ex. A.**

20.    On that date, Ziemba initially received a Disciplinary Report for Interfering with Safety and Security.  **Ex. E.**  As a result of this initial Disciplinary Report, the plaintiff was placed in the Restrictive Housing Unit at Cheshire, where his behavior rapidly deteriorated. **Ex. E.**

21.    The plaintiff "began yelling and banging on the cell door.  Shortly thereafter, with [Major Hall and then Commissioner Armstrong] in his unit, he flooded his cell, banged on the door, and partially removed the toilet from its secured position."  **Ex. E.**  Even after the toilet was removed and the water shut off, the plaintiff "continued to manifest his frustrations through physical destruction of state property and a self-injurious disposition."  **Ex. E.**

22.    This was the second time the plaintiff had either removed or partially removed a toilet from its fixed position within a cell.  **Ex. E.**

23.    Correctional officials at Cheshire then placed the plaintiff in four point soft restraints.  **Ex. E.**

24.     The plaintiff was able to and did free himself from the soft restraints and was then placed in "hard restraints", as in handcuffs and chains, and was placed on "four-point status". Even on four point status, the plaintiff continued "yelling at Lt. Murray and acting again in a hostile manner." .**Ex. E.**

### 3.     Time Period in Question

25.     Based on all of this behavior, the plaintiff was once again returned to Northern on May 18, 2002.  It is the time period from May 18, 2002 until April 20, 2003 during which the plaintiff claims he was denied sufficient opportunity for unrestrained outdoor exercise.

26.     Three months after his placement in Phase I of the Administrative Segregation program at Northern, the plaintiff received a Disciplinary Report for Interfering with Safety and Security.  **Ex D.**

27.     In the incident leading to this Disciplinary Report on August 27, 2002, the plaintiff refused to allow correctional officials to remove their restraints.  **Ex. E.**  During the incident "Ziemba continued his verbal threats and stated he was going to sue all staff present." **Ex. E.**

28.     Several weeks later, on October 1, 2002, the plaintiff was convicted of another Disciplinary Report, this one for fighting, and another month later, on November 4, 2002, he received yet three more Disciplinary Reports for Destruction of Property, Flagrant Disobedience, and Interfering with Safety and Security.  **Ex. E**.

29.     Early in the new year, the plaintiff was convicted of two more Disciplinary Reports, one for Contraband and another for Destruction of Property.  **Ex. E**.

30.     The combination of Ziemba's repeated disciplinary problems resulted in the plaintiff's continued confinement in Phase I of the Administrative Segregation program at Northern. **Ex. G, Captain Shea Aff. ¶ 4.**

### 4.         Administrative Segregation Program at Northern

31.     Northern was at the time in question and is now the designated restrictive housing facility for the Connecticut Department of Correction, managing those inmates who have demonstrated a serious inability to adjust to confinement in prison and pose a serious threat to the safety and security of a correctional facility. **Exs. H Northern website description; G ¶ 5.**

32.     Placement in the Administrative Segregation Program at Northern both in 1999 and since then comes after a hearing, and the decision of the Hearing Officer may be appealed. **Exs. I, Administrative Segregation description; G ¶ 6.**

33.     Since 1999, the Administrative Segregation Program has consisted of a three phase program. **Exs. H; I; G, ¶ 7.**

34.     The Administrative Segregation Program "operates on the basic assumption that inmates who engage in aggressive, violent, disruptive behavior, or who pose an imminent risk … require a highly structured and secure environment." **Exs. H; I; G ¶ 8**.

35.     In Phase I, which at the time lasted for at least six months if an inmate was discipline free, or longer if not, inmates are allowed very little time out of their cells. **Exs. H; I; G, ¶ 9**.

36.     Meals are eaten in the cells; inmates are restricted to three showers and five hours of recreation per week. **Exs. H; I G**. Phase I inmates are precluded from any work assignments. **Exs. H; I; G ¶ 9**.

37.     While he was housed in Phase I of the Administrative Segregation program at Northern, the plaintiff was housed in Units One West and One East.  **Exs. G ¶ 10; H.**  While in Phase I, the plaintiff typically shared a cell with another inmate.  **Ex. G ¶ 10.**

38.     The size of the double cell that the plaintiff shared while in Phase I was approximately 8 by 10 feet, containing nearly 80 square feet.  **Ex. G ¶ 11.**  The cell contained two narrow beds one over the other, and a toilet.  **Ex. G ¶ 11.**

39.     Recreation in Phase I was and is provided for one hour per day five days per week, but is entirely voluntary.  **Ex. G ¶ 12.**  It was the policy at Northern up until April of 2003 that inmates in Phase I of the Administrative Segregation program, no matter the length of time they had been in Phase I, were required to participate recreation in full restraints for the entire duration of their stay in Phase I.  **Ex. G ¶ 13.**

40.     This is still the policy for inmates who have initially been placed in Phase I of the Administrative Segregation program at Northern, although the policy has been changed so that the rule regarding recreating in restraints *may* be relaxed after 30 days under certain conditions.  **Ex. G ¶ 14.**

41.     For his one hour of recreation five days per week, a Phase I inmate is escorted in full restraints into an outdoor recreation area surrounded by a chain link fence.  **Ex. G ¶ 15.**  The inmate remained in full restraints for the duration of the hour, and then was escorted back to his cell.  **Ex. G ¶ 15.**

42.     The inmate is free to walk and move about the recreation area in the fresh air, and inmates recreating in this manner usually spend most of the time walking around.  **Ex. G ¶ 16.**  The recreation yard is approximately 20 by 20 feet.  **Ex. G ¶ 16.**

43.     Full restraints within the Connecticut Department of Correction includes handcuffs behind the back, leg irons, and a tether chain from the leg irons to the handcuffs. **Ex. G ¶ 17.**

44.     While the restricted conditions of recreation for a Phase I Administrative Segregation inmate are a far cry from the basketball, television, volleyball and other indoor and outdoor recreational activities available to Connecticut's general population inmates at the time and currently, these measures were considered necessary due to the security threat posed by Phase I inmates given their behavior resulting in placement in Phase I. **Ex. G ¶ 18.**

45.     Inmates who have shown a propensity for violence against correctional staff or other inmates within a correctional setting have been can be ingenious in their destructiveness. **Ex. G ¶ 19.**

46.     They can hold trap doors open while unrestrained, they can swing handcuffs around after the first one is applied to one hand, and they refuse to re-cuff, among other things, all of which can disrupt the daily routine of a facility. **Ex. G ¶ 20.**

47.     Thus, the defendants do not dispute that during the time period in question, inmates in Phase I of the Administrative Segregation were required to recreate in restraints for reasons of safety and security. **Ex. G ¶ 21.** Inmates in Phase I Administrative Segregation both now and during the time in question are not, however, restrained during the time that they spend inside their cell. **Ex. G ¶ 21.**

48.     The cells at Northern are large enough to accommodate calisthenics such as sit-ups, push-ups, jumping and running in place. **Ex. G ¶ 22.** The policy of recreating Phase I Administrative Segregation inmates at Northern in restraints while they could do more intensive

calisthenics in their cell accommodated both the inmates' needs for fresh air, walking, and time out of their cell while allowing the inmates' needs for more vigorous exercise, if they chose to engage in it, to be accomplished within the confines of their cell.  **Ex. G ¶ 23.**

2.        **Facts Regarding the Plaintiff's Medical History**

49.        Plaintiff's medical records do not indicate any significant problem with plaintiff's back.  **Exs. M, medical records; N, Dr. Blanchette Aff. ¶ 6.**

50.        In March of 1998, long before his placement at Northern, yet while in custody, plaintiff's back was x-rayed twice with two different views after an altercation with an officer, and other x-rays to rule out back problems followed.  **Exs. M, 190, 191, 192, 222, 224, 311, 313, 315; N ¶ 7.**

51.        The conclusion reached by one radiologist was "Minimal anterior wedging of what appears to be T7, ? old Scheuermann's disease."  **Exs. M 190; N ¶ 8.**  Scheuermann's disease is a condition formed during growth years when the front of a disc or discs in the back do not grow at the same pace as the back.  **Ex. N ¶ 8.**

52.        The radiologist reading the report also said that the *minimal* wedging he noted could also be the product of trauma.  **Exs. M 190; N ¶ 9.**

53.        Earlier that same month, another radiologist reported that several "views of the lumbosacral spine reveal no evidence for acute fracture or dislocation.  No subluxation is evident."  **Exs. M 191; N ¶ 9.**

54.        Also on that date the radiologist concluded "No acute abnormality of the lumbosacral spine."  **Exs. M 192; N ¶ 10.**   He also noted "*mild*" narrowing at the cervical

portion of the plaintiff's spine, but again concluded, "No acute fracture, subluxation or dislocation evident." **Exs. M 192; N ¶ 10.**

55.    In April of 1998, approximately one month later, additional x-rays of the plaintiff's back (and sinuses) were taken. **Exs. M 189; N ¶ 11.** The conclusion again with regard to the Thoracic spine was "No significant interval change". **Exs. M 189; N ¶ 11**.

56.    In May of 1998, a doctor ordered x-rays of plaintiff's back and the plaintiff complained about the x-rays. **Exs. M 222; N ¶ 12.** The plaintiff argued with medical staff that month, May of 1998, about the cause of his alleged back problems. **Exs. M 221; N ¶ 12.**

57.    The plaintiff's doctor noted in May of 1998 that there were no acute changes on spinal x-rays but that the plaintiff was "unsatisfied with NSAID [anti-inflammatory medicine; Motrin] and bedrest." **Exs. M 224, 228; N ¶ 13.**

58.    The treatment plan for plaintiff at that time was to continue conservative management and seek an orthopedic consult if an "adverse clinical change occurred." **Exs. M 224; N ¶ 14.** The reporting doctor indicated with regard to the plaintiff, "He feels pain is being ignored. Litigation is highly likely." **Exs. M, 228; N ¶ 15.**

59.    In June of 1998, plaintiff complained to medical staff, "You had x-rays of my back taken and told me they show nothing wrong. I am again telling you something is seriously wrong." **Exs. M 217; N ¶ 16.**

60.    Medical staff responded that the plaintiff had been seen 5 times from March to May of 1998 and had as of the last visit reported being comfortable after Motrin. **Exs. M 217; N ¶ 17.**

61.     None of the custodial defendants were involved in any decisions regarding treatment for the plaintiff's alleged back pain during the time period in question.  The defendant Dr. Wright did treat the plaintiff on one occasion, as described below.

62.     Although Nurse Wollenhaupt did respond to many of plaintiff's written requests regarding his alleged back pain and other issues by noting that the plaintiff had been seen by a doctor regarding this alleged pain, she did not make medical decisions regarding the plaintiff's treatment for his back.  **Exs. M 218, 220, 221, 222, 223, 236, 238, 23, 240, 241, 242, 248, 249, 250, 251, 252, 253, 254 259, 273, 288, 289; N ¶ 18**.

63.     While there is certainly ample evidence that plaintiff complained about a back problem in 1998 and thereafter, there is likewise ample documentation that plaintiff was seen and treated for his alleged back problems by medical staff, that his problem was not ignored, Motrin and Tylenol were prescribed, and no acute or serious back injury was ever determined to exist.  **Exs. M 189, 190, 191, 192,  217, 218, 220, 221 222, 223, 228, 232, 236, 238, 239, 240, 241, 242, 248, 249, 250, 251, 252, 253, 254, 259 273, 288, 289, 301; N ¶ 19.**

64.     In terms of plaintiff's condition as perceived by medical staff, aside from his verbal complaint, the following was noted:

> No change in x-ray findings.
> Lumbar spine, no vertebral tenderness
> No limp in walk
> Lumbar pain L [left] sided more than thoracic spine level pain

**Exs. M 304; N ¶ 20.**

65.     These objective findings do not support plaintiff's claims about a serious back condition being mistreated by the application of restraints in the back.  **Ex. N ¶ 21.**  Indeed, handcuffing a person in the back stretches the front, chest muscles, but would have no impact on the back one way or another.  **Ex. N ¶ 21.**

66.     On April 20, 1998, while at MacDougall-Walker Correctional Institution, the plaintiff wrote an Inmate Request Form in which he stated, "I refused a medical trip today because my back seriously hurts.  It is not humane for belly-chains to be raped [sic]  around my back with padlock behind my back.  I was 3:00 AM forced to refuse trip for this reason.  I am trying to heal not be hurt worse.  Can this be rescheduled with restraints being used anyway but raped [sic]  around my back.?"  **Exs. A; M 253; N ¶ 22.**

67.     Nurse Wollenhaupt stated to the plaintiff in response to his requests that, "Unfortunately, we can not deviate from the Administrative Directive.  You have no gross documented anomalies of the back.  We will try to rebook it if you agree to go according to the Administrative Directive."  **Exs. M 253; N ¶ 23.**

68.     Interestingly, plaintiff's request to be transported with less restrictive restraints to a medical appointment at an "outside" hospital, UConn, due to a purely subjective back problem, predated by only months his escape attempt in August of 1998, and came after his criminal escape from DOC community placement.  **Exs. M 253; D; E 139; F.**

69.     In May of 1998, Dr. Silvis, not a defendant in this matter, noted the plaintiff, still at MacDougall, was "Upset because I noted in chart he refused to go to UCONN wearing certain restraint—This is simply a well documented fact that can not be covered-up to help I/M [inmate] Ziemba in his personal use of his medical file."  **Exs. A; M 296; N ¶ 24.**

70.    The doctor further noted on that date that he had requested an orthopedic visit for the plaintiff "because unsatisfied."  **Exs. M 297; N ¶ 25.**  The doctor further noted, "Back pain complaints have been on-going since initial assault.  No change in x-rays c/ [with] no fx [fracture] ever seen."  **Exs. M 297; N ¶ 26.**

71.    On a separate occasion in May of 1998, the plaintiff indicated to other medical staff that "He had not issues about the restraints except that he asked custody staff to be 'reasonable'"  **Exs. M 301; N ¶ 27.**  While in April of 1998, medical staff felt the plaintiff might have experienced a muscle spasm in his back, staff charted that the plaintiff himself aggravated this by working out.  **Exs. M 307; N ¶ 28.**

72.    Medical staff prescribed Motrin and Naproxen for plaintiff's pain from April through July of 1998.  **Exs. M 390-392; N ¶ 29.**

73.    In August of 1998, the plaintiff's back was functioning well enough that he was able to rip the toilet off of the floor or wall of his cell at Garner, break a fixture in the ceiling and crawl up into the ceiling.  **Exs. M 355, 540, 541; D; E 139; F; A; N ¶ 30.**

74.    The plaintiff was also able to destroy three sets of handcuffs at this time, breaking two sets at one time.  **Exs. M 505, 541.**  This was considered an escape attempt.  **Ex. D.**  At this point in time, the plaintiff was restrained and medical staff checked on him frequently, typically every two hours.  **Exs. M 492-502; N ¶ 31.**

75.    During all of these checks, the plaintiff made no complaints of back pain, and medical staff noted on more than one occasion, "No c/o [complaints of] discomforts and no obvious s/s [signs or symptoms] of distress."  **Ex. M 492-502; N ¶ 32.**

76.     The plaintiff was transferred to Northern at this time.  **Ex. A.**  On September 8, 1998, plaintiff complained to staff that his back was not getting better and he was referred to "Sick Call" which is how inmates make a medical appointment.  **Exs. M 485; N ¶ 33.**

77.     Also in September of 1998, another x-ray was taken of plaintiff's back.  **Exs. M 517; N ¶ 34.**  The results were provided by UConn radiology, which noted, "Some degenerative changes, no acute disease."  **Exs. M 517; N ¶ 34.**

76.     Clinical notes from September 11, 1998, reflect an extensive exam of plaintiff's complaints as related to his back vis-à-vis objective factors related to back pain.  **Exs. M 519, 520; N ¶ 35.**

77.     Seeing Nurse Clark, the plaintiff complained as follows:

C/O [complains of] back pain since August 12th – c/o lower back pain that goes down my right leg.  I/M states previous hx [history] of back problems c/ [with] hospitalization for back on March of 1998.

**Exs. M 520; N ¶ 36.**

78.     Obviously, this was a fabrication as the plaintiff's records from 1998 do not support any such "hospitalization for back on March of 1998."  **Exs. M 190-220; N ¶ 37.** Indeed, the plaintiff's report of a back injury in 1998 was contradicted by his statement to Nevada medical personnel in 2000 that he had a "Back injury prior to incarceration."  **Exs. M 1115; N ¶ 38.**

79.     Nurse Clark further noted  in September of 1998: "gait observed steady;  I/M slowly becoming verbally aggressive and demanding stating that he needs to be cuffed in front because he is 'so tall and my back hurts.'"  **Exs. M 520; N ¶ 39.**

80.    The plaintiff wanted to be cuffed in front a month after destroying a cell and mechanical restraints. **Exs. M 253; N ¶ 40.** Cuffing certain inmates in front is considered a potential security risk as inmates can swing the cuffs about, causing injury, and inmates have been known to attempt to strangle others or otherwise cause harm when cuffed in front. **Ex. G.**

81.    Nurse Clark noted as follows:

Sick call process explained to i/m [inmate] and his hx [history] of refusing to see the MD also discussed c/ i/m [with inmate].  No obvious distress or extreme discomfort noted; I/M denies being able to bend over to remove his sock for nurse to examine foot however custody staff reports that I/M is able to dress self and tend to … [illegible] c/ [with] no requests of assistance;
As stated, inmate denies exercising in cell but muscle tone noted to be good;
I/M also initially stated that he was unable to move his toes but then stated he could move them;  I/M noted to be able to propel body on and off exam table s/ [without] assistance and no c/o [complaints of] discomforts.    I/M noted to bend at waist to sign inmate fee form c/ no c/o.

**Exs. M 519; N ¶ 41.**

82.    Nurse Clark concluded as follows:  "P) [Plan:]  Continue c/ [with] cuff status in back per custody protocol." **Exs. M 519; N ¶ 42.**

83.    In late September of 1998, the plaintiff engaged in behavior unlikely for someone with severe back pain, leading correctional staff to extract him from his cell. **Exs. M 483; N ¶ 43.** At this point in time, the plaintiff complained of "internal bleeding" which was never substantiated, but did not complain of back problems and "denie[d] any other medical concerns/issues." **Exs. M 483, 484; N ¶ 44.**

84.    In October of 1998, the plaintiff complained of several issues, including his back. **Exs. M 515; N ¶ 45.** Medical staff noted at that time that the plaintiff had "full mobility, able to amb[ulate] c/o [without] difficulty, [Zero] s/o [signs of] trauma." **Exs. M 515; N ¶ 45.** The plaintiff was given Motrin at this time. **Exs. M 515; N ¶ 46.**

85.     In February of 1999, the plaintiff complained of back pain and was seen by medical staff.  **Exs. M 518; N ¶ 47.**  Staff referred the plaintiff to the September 1998 x-rays, and the plaintiff requested follow-up x-rays, and was referred to "MDSC", sick call with a doctor.  **Exs. M 518; N ¶ 47.**

86.     On March 4-5, 1999, the plaintiff was again in four-point restraints and thus assessed by medical staff at Northern.  **Exs. M 456, 458; N ¶ 48.**  The plaintiff did complain of lower back pain at this time, on some of the medical checks he received, along with numerous other issues, although he did not always complain of back pain at this time.  **Exs. M 456-467, 476-477; N ¶ 49.**

87.     On March 9, 1999, the plaintiff had a physical incident with correctional staff after refusing an order and several medical issues were reported, none of which included his back.  **Exs. M 422; N ¶ 50.**

88.     The plaintiff's obviously lengthy medical chart reveals that he was seen frequently by various medical staff, including doctors, nurses and other professional on a frequent basis.  **Exs. M; N ¶ 51.**

89.     Nurse Wollenhaupt was certainly entitled to rely on the assessments of various medical staff, and as a nurse responding to grievances or referring the plaintiff to a doctor or APRN, was not in a position to second-guess the orders or assessments of physicians or other medical personnel who had physically examined the plaintiff.  **Ex. N ¶ 52.**

90.     A review of the plaintiff's medical records reveals no objective back injury or any clinical reason to handcuff him in front.  **Exs. M; N ¶ 53.**

91.     On January 20, 2000, the plaintiff was transferred to Nevada.  When the plaintiff arrived in Nevada, he continued to complain of an alleged back injury from 1998.  **Ex. M 1052, 1053, 1064, 1065, 1068, 1069.**

92.     Prior to ever receiving any medical records from Connecticut, the doctor in Nevada opined, "**[P]art of his problem is that he is trying to get drugs, and they are not giving them to him**.  He is receiving medication for the pain, but not heavy duty drugs."  **Ex. Q, Nevada Medical correspondence.**

93.     The plaintiff's alleged back pain does not constitute a "serious medical condition".  **Exs. M; N ¶ 54.**   In Nevada, the plaintiff's complaints about his back pain primarily occurred in the year 2000, two years prior to his return to Connecticut in 2002.  **Exs. M 1052, 1053, 1064, 1065, 1068, 1069, 1134; N ¶ 55.**

94.     At the plaintiff's Intake Physical Examination in Nevada on February, 2000, he reported that his spine was "abnormal".  **Exs. M 1030; N ¶ 56.**   Objectively, the examiners findings on that date were that his everything was "NL", or, within normal limits.  **Exs. M 1030; N ¶ 56.**

95.     Two years later, at his biennial physical on February 25, 2002, the plaintiff's spine was reported to be "normal".  **Exs. M 1029; N ¶ 57.**   Nevada prison officials had x-rays of the plaintiff's back performed in 2000.  **Exs. M 1083-86; N ¶ 58.**   No Nevada medical care provider ever opined that the plaintiff should only be handcuffed in the front.  **Exs. M; N ¶ 58.**

96.     One care provider noted in June of 2000 with regard to the plaintiff's back pain, "Subjective complaints only—no objective physical exam findings."  **Exs. M 1135; N ¶ 59.**

97.    The plaintiff was returned to Connecticut in March of 2002, when he was initially placed at Cheshire Correctional Institution (hereinafter "Cheshire") and, as stated above, was returned to Northern on May 18, 2002.  **Ex. A.**

98.    During the time period he was at Cheshire from March to May of 2002, the plaintiff complained only once of low back pain, and did not request that Cheshire medical staff issue an order that he only be handcuffed in the front.  **Exs. M 1272; N ¶ 60.**

99.    The incident that lead to the plaintiff's placement at Northern on this occasion was him flooding his cell and "banging on [the cell] door with extreme force" then subsequently breaking his restraints   **Ex. M 1269, 1366; N 61.**   The plaintiff's stated back injury is inconsistent with using his arm to bang on his cell door with extreme force.  **Ex. N ¶ 62.**

100.    Upon his initial placement at Northern, the plaintiff made no complaint of any back discomfort.  **Exs. M 1261-1270; N ¶ 63.**   In June of 2002, the plaintiff's back was x-rayed based on a referral by Dr. Pesanti and APRN Katz-Feinberg when the plaintiff complained of back pain on June 7, 2002.  **Exs. M 1182, 1260; N ¶ 64.**

101.    The conclusion of the UCONN radiologist was that the plaintiff has "mild diffuse degenerative arthritis."  **Exs. M 1182; N ¶ 65.**  This is an extremely common diagnosis, which in no way necessitates the plaintiff being handcuffed in the front and which does not constitute a serious medical condition.  **Ex. N ¶ 65.**

102.    On July 12, 2002, the plaintiff reported to the medical unit and saw the defendant Nurse Wollenhaupt.  **Exs. M 1257; N ¶ 66.**  All that Nurse Wollenhaupt did at this visit was refer the plaintiff to a doctor or APRN.  **Exs. M 1257; N ¶ 66.**

18

103.    Nurse Wollenhaupt did not make any decision at the time with regard to the plaintiff's healthcare other than the referral, which was appropriate, and the plaintiff was indeed seen three days later by APRN Katz-Feinberg. **Exs. M 1257; N ¶ 67.**

104.    Katz-Feinberg, who is not a defendant in this matter, made the following notations in plaintiff's health record regarding his back:

S [subjective]:  C/O [complains of] continued back pain.

O [objective]:    Mobility—able to get on/off exam table c/out

[without] difficulty, on/off chair—gait stable

A [assessment]:    **Stated** back pain.

**Exs. M 1257; N ¶ 68.**

105.    Katz-Feinberg prescribed Naproxen for the stated back pain of the plaintiff.  She did not address the issue of plaintiff's claim in this lawsuit that it was medically necessary for him to be handcuffed in the front of his body as opposed to the back.  **Exs. M 1257; N ¶ 69.**  The care the plaintiff received from both Wollenhaupt and Katz-Feinberg was appropriate and well within the standard of care.  **Ex. N ¶ 70.**

106.    In September of 2002, the plaintiff filed an Inmate Request form at Northern in which he stated, "Again, please immediately have the doctor order for custody staff to stop handcuffing me behind my back.  Because it's seriously re-injuring my back.  And denying me recreation."  **Ex. M 1211; N ¶ 71.**

107.    The plaintiff had filed a similar request only three days earlier.  **Exs. M 1212; N ¶ 72.**  Both requests were responded to simultaneously and appropriately.  **Exs. M 1211, 1212; N ¶ 72.**

108.    Nurse Wollenhaupt, who was not making decisions about the plaintiff's healthcare but who responded to his grievances noted correctly, "There is no medical contraindication to cuffing in the back.  If anything, there would be an extension of the chest muscle not the back muscle.  **Exs. M 1211; N ¶ 73.**

109.    Nurse Wollenhaupt also responded, "There is no medical problem that would interfere with cuffing in the back after three years."  **Exs. M 1212; N ¶ 74.**  This was an appropriate response by Nurse Wollenhaupt.  **Ex. N ¶ 74.**

110.    On November 1, 2002, the plaintiff reported to a nurse in the medical unit that his back was "seriously hurting" him.  **Exs. M 1256; N ¶ 75.**  The Registered Nurse evaluating him noted at the time that, despite his claims, the plaintiff ambulated within normal limits and was able to get in and out of the chair within normal limits.  **Exs. M 1256; N ¶ 75.**  Nonetheless, as had Nurse Wollenhaupt before her, this nurse referred the plaintiff to a doctor or APRN.  **Exs. M 1256; N ¶ 76.**

111.    Notwithstanding what he alleged to be a serious back condition on November 1, 2002, the plaintiff was able on November 5, 2002 to destroy the handcuffs he was wearing while on "in cell restraint status" for flooding his cell, a disciplinary status during which he was restrained within a cell.  **Exs. M 120, 1257, 1242-43; N ¶ 77.**

112.    He then reportedly became combative with staff when they intervened.  **Exs. M 1202; N ¶ 78.**   APRN Katz-Feinberg reported that the plaintiff "was trying to get out of his handcuffs and twisted open his cuffs in his bed frame injuring his wrists."  **Exs. M 1242-43; N ¶ 78.**

113.    Katz-Feinberg did not order nor recommend any special handcuffing procedure for the plaintiff at this point in time, nor was any such order or recommendation warranted.  **Exs. M 1242-43; N ¶ 79.**

114.    In early December of 2002, the plaintiff received correspondence from then Deputy Commissioner Tokarz "in response to your letter regarding pain in  your back and related to handcuffing behind  your back."  **Exs. M 1197; N ¶ 80.**

115.    Medical staff was aware that the plaintiff himself felt this was an issue, and the correspondence indicates the plaintiff's concern was being evaluated and addressed.  **Exs. M 1197; Npp 81.**

116.    On December 19, 2002, the defendant Dr. Wright diagnosed  the plaintiff as having "DJD", or degenerative joint disease, in his back.  **Exs. M 1230; N  ¶ 82.**  Degenerative joint disease, also known as osteoarthritis, is the most common form of arthritis, affecting tens of millions of adults in this country.  **Ex. N ¶ 83.**

117.    In diagnosing the plaintiff, Dr. Wright examined the plaintiff's x-ray reports from June of 2002, conducted a physical exam, and listened to the plaintiff's reported symptoms.  **Exs. M 1230; N ¶ 84.**  He then prescribed Naproxen.  **Exs. M 1230; N ¶ 84.**  Dr. Wright did not issue an order or recommendation that the plaintiff be handcuffed in the front, nor was one medically indicated or even advisable.  **Exs. M 1230; N ¶ ¶ 85.**

118.    Dr. Wright treated the plaintiff's common condition in an entirely appropriate manner well within the applicable standard of care.  **Ex. N  ¶ 86.**

119.    There was no medical necessity or reason to handcuff the plaintiff in the front as opposed to the back from May of 2002 though April of 2003 or at any time before or after that.

**Ex. N  ¶ 87.**  The plaintiff has received appropriate, professional health care for his back throughout his tenure as an inmate and all such care has been well within the applicable standard of care.  **Ex. N ¶ 88.**

DEFENDANTS,
John Armstrong, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:___/s/_____
Lynn D. Wittenbrink
Assistant Attorney General
Federal Bar No. ct08575
110 Sherman Street
Hartford, CT  06105
Telephone No.  (860) 808-5450
Fax No. (860) 808-5450
lynn.wittenbrink@po.state.ct.us


## CERTIFICATION

I hereby certify that a copy of the foregoing has been sent, first class postage prepaid, this 12th day of September, 2005 to:


Duane Ziemba, Inmate No. 128963
Garner Correctional Institution
50 Nuunawauk Road, PO Box 5500
Newtown, CT  06470

____/s/_____
Lynn D. Wittenbrink
Assistant Attorney General